## MILWAUKEE BREWERY WORKERS' PENSION PLAN *v.* JOS. SCHLITZ BREWING CO. ET AL.

No. 93–768.   Argued December 5, 1994—Decided February 21, 1995

BREYER, J., delivered the opinion for a unanimous Court.

*Michael G. Bruton* argued the cause for petitioner. With him on the briefs were *Neil K. Quinn, Robert Marc Chemers,* and *Mary Anne H. Capron.*

*Richard K. Willard* argued the cause for respondents. With him on the brief were *Sara E. Hauptfuehrer, James W. Greer,* and *David C. Hertel.**

JUSTICE BREYER delivered the opinion of the Court.

The Multiemployer Pension Plan Amendments Act of 1980 (MPPAA), 94 Stat. 1208, 29 U. S. C. §§ 1381–1461, provides that an employer who withdraws from an underfunded multi-employer pension plan must pay a charge sufficient to cover that employer's fair share of the plan's unfunded liabilities. The statute permits the employer to pay that charge in lump

---

*Briefs of *amici curiae* urging reversal were filed for the Central States Southeast and Southwest Areas Pension Fund by *Thomas C. Nyhan* and *Terence G. Craig;* and for the National Coordinating Committee for Multi-employer Plans by *K. Peter Schmidt* and *Philip W. Horton.*

sum or to "amortize" it, making payments over time. This case focuses upon a withdrawing employer who amortizes the charge, and it asks when, for purposes of calculating the amortization schedule, interest begins to accrue on the amortized charge. The Court of Appeals for the Seventh Circuit held that, for purposes of computation, interest begins to accrue on the first day of the year after withdrawal. We agree and affirm its judgment.

I

We shall briefly describe the general purpose of MPPAA, the basic way MPPAA works, and the relevant interest-related facts of the case before us.

A

*MPPAA's General Purpose*

MPPAA helps solve a problem that became apparent after Congress enacted the Employee Retirement Income Security Act of 1974 (ERISA), 88 Stat. 829, 29 U. S. C. § 1001 *et seq.* ERISA helped assure private-sector workers that they would receive the pensions that their employers had promised them. See, *e. g., Concrete Pipe & Products of Cal., Inc.* v. *Construction Laborers Pension Trust for Southern Cal.,* 508 U. S. 602, 605–609 (1993). To do so, among other things, ERISA required employers to make contributions that would produce pension plan assets sufficient to meet future vested pension liabilities; it mandated termination insurance to protect workers against a plan's bankruptcy; and, if a plan became insolvent, it held any employer who had withdrawn from the plan during the previous five years liable for a fair share of the plan's underfunding. See 26 U. S. C. § 412 (minimum funding standards); 29 U. S. C. § 1082 (same); 29 U. S. C. § 1301 *et seq.* (termination insurance); 29 U. S. C. § 1364 (withdrawal liability).

Unfortunately, this scheme encouraged an employer to withdraw from a financially shaky plan and risk paying its share if the plan later became insolvent, rather than to re-

main and (if others withdrew) risk having to bear alone the entire cost of keeping the shaky plan afloat. Consequently, a plan's financial troubles could trigger a stampede for the exit doors, thereby ensuring the plan's demise. See *Connolly* v. *Pension Benefit Guaranty Corporation*, 475 U. S. 211, 216 (1986); *Pension Benefit Guaranty Corporation* v. *R. A. Gray & Co.*, 467 U. S. 717, 722–723, n. 2 (1984); see also 29 U. S. C. § 1001a(a)(4); H. R. Rep. No. 96–869, pt. 1, pp. 54–55 (1980); D. McGill & D. Grubbs, Fundamentals of Private Pensions 618–619 (6th ed. 1989). MPPAA helped eliminate this problem by changing the strategic considerations. It transformed what was only a risk (that a withdrawing employer would have to pay a fair share of underfunding) into a certainty. That is to say, it imposed a withdrawal charge on all employers withdrawing from an underfunded plan (whether or not the plan later became insolvent). And, it set forth a detailed set of rules for determining, and collecting, that charge.

## B

### *MPPAA's Basic Approach*

The way in which MPPAA calculates interest is related to the way in which that statute answers three more general, and more important, questions: *First,* how much is the withdrawal charge? MPPAA's lengthy charge-determination section, § 1391, sets forth rules for calculating a withdrawing employer's fair share of a plan's underfunding. See 29 U. S. C. § 1391. It explains (a) how to determine a plan's total underfunding; and (b) how to determine an employer's fair share (based primarily upon the comparative number of that employer's covered workers in each earlier year and the related level of that employer's contributions).

One might expect § 1391 to calculate a withdrawal charge that equals the withdrawing employer's fair share of a plan's underfunding *as of the day the employer withdraws.* But, instead, § 1391 instructs a plan to make the withdrawal

charge calculation, not as of the day of withdrawal, but *as of the last day of the plan year preceding the year during which the employer withdrew*—a day that could be up to a year earlier. See §§ 1391(b)(2)(A)(ii), (b)(2)(E)(i), (c)(2)(C)(i), (c)(3)(A), and (c)(4)(A). Thus (assuming for illustrative purposes that a plan's bookkeeping year and the calendar year coincide), the withdrawal charge for an employer withdrawing from an underfunded plan in 1981 equals that employer's fair share of the underfunding as calculated on December 31, 1980, whether the employer withdrew the next day (January 1, 1981) or a year later (December 31, 1981). The reason for this calculation date seems one of administrative convenience. Its use permits a plan to base the highly complex calculations upon figures that it must prepare in any event for a report required under ERISA, see 29 U. S. C. § 1082(c)(9), thereby avoiding the need to generate new figures tied to the date of actual withdrawal.

*Second*, how may the employer pay the withdrawal charge? The statute sets forth two methods: (a) payment in a lump sum; and (b) payment in installments. The statute's lump-sum method is relatively simple. A withdrawing employer may pay the entire liability when the first payment falls due; pay installments for a while and then discharge its remaining liability; or make a partial balloon payment and afterwards pay installments. See 29 U. S. C. § 1399(c)(4). The statute's installment method is more complex. The statutory method is unusual in that the statute does not ask the question that a mortgage borrower would normally ask, namely, what is the amount of each of my monthly payments? What size monthly payment will amortize, say, a 7% 30-year loan of $100,000? Rather, the statute fixes the amount of each payment and asks how many such payments there will have to be. To put the matter more precisely, (1) the statute fixes the amount of each annual payment at a level that (roughly speaking) equals the withdrawing employer's typical contribution in earlier years; (2) it sets an interest rate,

equal to the rate the plan normally uses for its calculations; and (3) it then asks how many such annual payments it will take to "amortize" the withdrawal charge at that interest rate. 29 U. S. C. §§ 1399(c)(1)(A)(i), (c)(1)(A)(ii), (c)(1)(C).

It is as if Brown, who owes Smith $1,000, were to ask, not, "How much must I pay each month to pay off the debt (with 7% interest) over two years?"—but, rather, "Assuming 7% interest, how many $100 monthly payments must I make to pay off that debt?" To bring the facts closer to those of this case, assume that an employer withdraws from an under-funded plan in mid-1981; that the withdrawal charge (calculated as of the end of 1980) is $23.3 million; that the employer normally contributes about $4 million per year to the plan; and that the plan uses a 7% interest rate. In that case, the statute asks: "How many annual payments of about $4 million does it take to pay off a debt of $23.3 million if the interest rate is 7%?" The fact that the statute poses the installment-plan question in this way, along with an additional feature of the statute, namely, that the statute forgives all debt outstanding after 20 years, 29 U. S. C. § 1399(c)(1)(B), suggests that maintaining level funding for the plan is an important goal of the statute. The practical effect of this concern with maintaining level payments is that any amortization interest § 1399(c)(1)(A)(i) may cause to accrue is added to the end of the payment schedule (unless forgiven by § 1399(c)(1)(B)).

*Third,* when must the employer pay? The statute could not make the employer pay the calculated sum (or begin to pay that sum) on the date in reference to which one calculates the withdrawal charge, for that date occurs before the employer withdraws. (It is the last day of the preceding plan year, *i. e.,* December 31, 1980, for an employer who withdraws in 1981.) The statute, of course, might make the withdrawing employer pay (or begin payment) on the date the employer actually withdraws. But, it does not do so. Rather, the statute says that a plan must draw up a schedule

for payment and "demand payment" as "soon as practicable" after withdrawal. 29 U. S. C. § 1399(b)(1). It adds that "[w]ithdrawal liability shall be payable . . . no more than 60 days after the date of the demand." § 1399(c)(2).

Thus, a plan that calculates quickly might demand payment the day after withdrawal and make the charge "payable" within 60 days thereafter. A plan that calculates slowly might not be able to demand payment for many months after withdrawal. For example, in the case of the employer who withdraws on August 14, 1981, incurring a withdrawal charge of $23.3 million (calculated as of December 31, 1980), the lump sum of $23.3 million, or the first of the installment payments of roughly $4 million, will become "payable" to the plan "no later than 60 days" after the plan sent the withdrawing employer a demand letter. The day of the first payment may thus come as soon as within 60 days after August 15, 1981, or it may not come for many months thereafter, depending upon the plan's calculating speed.

## C

### *This Case*

The facts of this case approximate those of our example. Three brewers, Schlitz, Pabst, and Miller, contributed for many years to a multiemployer pension plan (Plan). On August 14, 1981, Schlitz withdrew from the Plan. See App. 151–152. By the end of September 1981, the Plan completed its calculations, created a payment schedule, and sent out a demand for payment (thereby making the first installment payment "payable") "on or before November 1, 1981." *Id.*, at 153, 154. From the outset, the parties agreed that the annual installment payment amounted to $3,945,481, and that the relevant interest rate was 7% per year. After various controversies led to arbitration and a court proceeding between Schlitz and the Plan, the courts and parties eventually determined that the withdrawal charge (calculated as of the

last day of the previous plan-bookkeeping year, December 31, 1980) amounted to $23.3 million.

But the parties disagreed whether interest accrued during 1981, the year in which Schlitz withdrew. The Plan claimed that, for purposes of calculating the installment schedule, interest started accruing on the last day of the plan year preceding withdrawal (December 31, 1980). Schlitz, on the other hand, argued that accrual began on the first day of the plan year following withdrawal (January 1, 1982). Under either reading, the number of annual payments is eight. But, under the Plan's reading, the final payment would amount to $3,499,361, whereas, in Schlitz's reading, that payment would amount to $880,331.

The arbitrator in this case agreed with Schlitz's reading. See 9 EBC 2385, 2405 (1988). The District Court, reviewing the arbitration award, disagreed, No. 88–C–908 (ED Wis., June 6, 1991), reprinted in App. 25, 62–69, but the Court of Appeals for the Seventh Circuit reversed the District Court, 3 F. 3d 994 (1993). Because the Seventh Circuit's decision conflicts with a holding of the Third Circuit, *Huber* v. *Casablanca Industries, Inc.*, 916 F. 2d 85, 95–100 (1990), cert. dism'd, 506 U. S. 1088 (1993), this Court granted certiorari, 512 U. S. 1234 (1994). Our conclusion, like that of the Seventh Circuit, is that, for purposes of computation, interest does not start accruing until the beginning of the plan year after withdrawal.

II

At first glance, the statutory provision that (the parties agree) governs this case seems silent on the issue of withdrawal-year interest. Indeed, it does not mention interest directly at all. Rather, it says that a withdrawing employer

"shall pay the amount determined under section 1391 . . . over the period of years necessary *to amortize the amount* in level annual payments determined under sub-

paragraph (C), *calculated as if the first payment were made on the first day of the plan year following the plan year in which the withdrawal occurs* and as if each subsequent payment were made on the first day of each subsequent plan year." 29 U. S. C. § 1399(c)(1)(A)(i) (emphasis added).

After considering the parties' arguments, which focus upon the emphasized language, we have become convinced that, for purposes of computation, this provision, although causing interest to accrue over subsequent plan years, does not cause interest to accrue during the withdrawal year itself.

## A

The Plan points out, and we agree, that the word "amortize" normally assumes interest charges. After all, the very idea of amortizing, say, a mortgage loan, involves paying the principal of the debt over time along with interest. But the Plan (supported by the Government, which is taking a view of the matter contrary to the view the Pension Benefit Guaranty Corporation took in the *Huber* case, see 916 F. 2d, at 96) goes on to claim that the word "amortize" indicates that interest accrues during the withdrawal year as well as during subsequent years. We do not agree with that claim. In our view, one generally does not pay interest on a debt until that debt arises—that is to say, until the principal of the debt is outstanding. And the instruction to calculate payment as if the first payment were made at the beginning of the following year tells us to treat the debt as if it arose at that time (*i. e.*, the first day of the year after withdrawal), not as if it arose one year earlier.

For one thing, unless a loan is involved, one normally expects a debtor to make a first payment at the time the debt arises, not one payment cycle later. Suppose, for example, that a taxpayer arranges to pay a large tax debt in four quarterly installments. Would one not expect the taxpayer to make the first payment on April 15, the day the tax debt

becomes due?  Similarly, would one not expect a buyer of, say, a business to make the first payment (a down payment) at the time of the closing?  By way of contrast, when a loan is involved (say, when one borrows money on a home mortgage and repays it in installments), interest accrual normally does begin before the first payment.  That is because the borrower has had the use of the money for one cycle before the first payment.  In the case of a loan, it would seem pointless, and would simply generate an unnecessary back-and-forth transfer of money, for a first repayment to take place on the very day the lender disburses the loan proceeds.

The "first payment" at issue here, however, looks more like a tax or purchase-money installment than a loan installment. Under the statute, the withdrawing employer's debt does not arise at the end of the year preceding the year of withdrawal. In fact, the employer may not have withdrawn from the plan at the beginning of the year, but instead may have continued to make its ordinary contribution until well into the year. In any event, the statute makes clear that the withdrawing employer owes nothing until its plan demands payment, which will inevitably happen some time after the beginning of the year.  See 29 U. S. C. §§ 1399(b)(1), (c)(2).  In fact, the withdrawing employer cannot determine, or pay, the amount of its debt until the plan has calculated that amount—which must take place some time after the beginning of the withdrawal year.  All these features make it difficult to find any analogy in withdrawal liability to a loan.

For another thing, we cannot easily reconcile the Plan's reading of the statute with the statutory provision that permits an employer to pay the amount owed in a lump sum. That provision says that a withdrawing employer

"shall be entitled to prepay the outstanding amount of the unpaid annual withdrawal liability payments determined under [§ 1399(c)(1)(C)], plus accrued interest, if any, in whole or in part, without penalty."  § 1399(c)(4).

We read this provision to permit an employer, by paying a lump sum, to avoid paying the amortization interest that § 1399(c)(1)(A)(i) would otherwise cause to accrue. (Under any other reading, the prepayment provision would not create much of an "entitle[ment]." Moreover, the prepayment provision refers to "payments determined under [§ 1399(c)(1) (C)]"—not § 1399(c)(1)(A), the provision that causes amortization interest to accrue.) It would seem odd if the prepayment provision enabled an employer to avoid all interest except the interest accruing during the year of withdrawal. And, if interest accrued from the last day of the year before withdrawal, there would hardly ever be a time that no interest was due. Such a reading would thus make it very difficult to give meaning to the words "if any" in the phrase "plus accrued interest, if any." (The Third Circuit suggested that these words might refer to a lump-sum payment made immediately after a scheduled installment. See *Huber*, 916 F. 2d, at 99. We agree that they could, theoretically. But, realistically speaking, it seems unlikely that Congress inserted "if any" to deal with such an unusual event.)

Further, the interpretation under which interest would accrue from the last day of the year before withdrawal is difficult to reconcile with the statutory language that defines a withdrawing employer's basic liability. Section 1381(a) says that the withdrawing employer becomes "liable to the plan in the amount determined under this part to be the withdrawal liability." Section 1381(b)(1) defines "withdrawal liability" as "the amount determined under section 1391." Yet, § 1391 says nothing about a year's worth of interest. Why then read the provision here at issue so that it inevitably and always creates liability in the amount of the withdrawal charge *plus one year's interest*, irrespective of when the employer, in fact, withdraws and how or when the employee begins to pay?

Finally, the provision here at issue asks one to calculate the installment payments as if the "first payment" was made,

not on the *last day* of the withdrawal year, but on the *"first day"* of the next year, *i. e.,* one year *plus one day* after the withdrawal charge calculation date. This choice of time (a year and a day) would be an odd way to signal that one is to treat the first payment as if it occurred at the *end* of a cycle.

### B

The Plan (and supporting *amici*) make several arguments in support of a reading in which, for purposes of calculation, interest starts accruing on the last day of the year before withdrawal. But we are not persuaded.

*First,* the Plan argues that our interpretation works against the basic objective of the statute, requiring a withdrawing employer to pay a fair share of the underfunding. Under our interpretation, says the Plan, the withdrawing employer will fail to pay a year's worth of interest on the withdrawal charge, thereby requiring the remaining employers to make up what, in fact, was part of the withdrawing employer's fair share. Suppose, for example, that an underfunded plan needed exactly $20 million as of the end of 1980 to create a sum that would grow to just the amount needed to pay then-vested benefits falling due, say, in 1999. By the end of 1981 that same plan would need more money; indeed, if we assume the $20 million would have grown 7% each year, it would need 7% more to pay those same vested 1999 benefits. Thus, if the withdrawing employer's fair share of the $20 million is $3 million as of the end of 1980, its fair share must have grown to $3,210,000 by the end of 1981. Why, asks the Plan, should the remaining employers have to make up for this missing $210,000?

One answer to the Plan's question is that the $210,000 will not necessarily be missing. For one thing, until the employer withdraws, it will be required to make contributions that should contain a component designed to reduce underfunding. See 26 U. S. C. § 412(b)(2); 29 U. S. C. § 1082. For another thing, if a plan moves quickly, it may be able to force

a withdrawing employer to begin making installment payments even before the end of the withdrawal year. Either way, to charge such an employer a full year's worth of interest would overcharge that employer and thereby provide the remaining employers with a kind of underfunding-reduction windfall.

Another answer is that we are not convinced that MPPAA aims to make withdrawing employers pay an actuarially perfect fair share, namely, a set of payments in amounts that, when invested, would theoretically produce (on the plan's actuarial assumptions) a sum precisely sufficient to pay (the employer's proportional share of) a plan's estimated vested future benefits. For one thing, the statute forgives *de minimis* amounts. See 29 U. S. C. § 1389. For another thing, it forgives all annual installment payments after 20 years, see § 1399(c)(1)(B)—and that means that, if an employer's normal annual contribution was low compared to the withdrawal charge, the presence or absence of withdrawal-year interest (which shows up at the end of the payment schedule, see *supra*, at 419) will make no difference (for the last payments will never be made). Finally, in making the first installment "payable" only after a plan demands it, MPPAA contemplates that an employer sometimes may pay its actual first installment long after the withdrawal year—as was the case in *Huber, supra*, at 88 (2½-year delay)—in which case no interpretation of the statute can avoid an employer's actually paying something less than its fair share of interest.

*Second*, the Plan argues that the statute's language favors its interpretation. It refers to a dictionary that defines an amortization plan as "'one where there are partial payments of the principal, *and accrued interest*, at stated periods for a definite time, at the expiration of which the entire indebtedness will be extinguished,'" Brief for Petitioner 27 (quoting Black's Law Dictionary 76 (5th ed. 1979)) (emphasis added), and to another definition that says that, "'[i]f a loan is being repaid by the amortization method, *each payment*

is partially repayment of principal and partially payment of interest,'" Brief for Petitioner 27 (quoting S. Kellison, The Theory of Interest 169 (2d ed. 1991)) (emphasis added). These definitions accurately describe the repayment of loans. But, they do not seem to focus upon whether or not one would normally include interest in the first installment of an amortized payment of a debt that is not a loan. We have no reason to believe they intend to define away the issue before us here.

The Plan adds that our reading of the statute makes the first "as if" clause in § 1399(c)(1)(A)(i) superfluous because, "if Congress had not intended to include interest in the first payment, it could have simply provided that the presumed payment schedule should be calculated as if payments were made annually." Brief for Petitioner 38. It seems to us that the premise of this argument is that, without contrary indication, one would expect that, in the case of an indebtedness of the kind here at issue, interest would not start accruing before the first payment is due—a premise with which we agree, see *supra*, at 422–423. More importantly, had Congress not used the words "as if the first payment were made on the first day of the plan year following the plan year in which the withdrawal occurs," the reader might have thought that interest would begin to accrue immediately upon withdrawal, a reading that has some intuitive appeal, see 3 F. 3d, at 1004 ("An assessment of interest between the date of withdrawal and the date on which payments begin . . . would not be troubling"). But, the first "as if" clause makes clear that interest does not begin accruing on that date. (The same concern may explain the second "as if" clause in § 1399(c)(1)(A)(i), concerning subsequent payments. Without that clause, one might think that one should calculate the amortization schedule as if the first payment is made out of order, and as if each successive payment is made on the anniversary of the date of withdrawal.)

We recognize that Congress might have been more specific. For example, it could have said: "Calculate amortization as if the first payment is made on the date the employer's withdrawal liability is due" (had it intended interest to start accruing on that date); or: "Calculate amortization as if each payment is made on the last day of the year at the beginning of which it is due" (had it intended interest to start accruing one cycle before the first payment is due). Instead, Congress said that one should calculate amortization "as if the first payment were made on the first day of the plan year following the plan year in which the withdrawal occurs." And, that actual language, as we have said, offers more support for our interpretation than for the alternative. Were we to read the actual language as does the Plan, we would have to analogize the valuation date (the last day of the year preceding withdrawal) to the date on which liability arises; to the date on which the debt becomes "payable"; or to the date on which the employer withdraws. But, in fact, the calculation date is none of those things; it is a date chosen simply for ease of administration; and ease of administration does *not* require choosing the same date for interest-accrual purposes. See 3 F. 3d, at 1004 ("Establishing a simple rule for calculating funding shortfalls has nothing to do with interest").

*Third,* the Plan points to legislative history. The Plan says that the original bill provided that interest would not begin accruing until the date of withdrawal. And, the Plan points out, just like the version that ultimately became law, the bill located the valuation date (the date as of which the withdrawing employer's share in the plan's underfunding is determined) at the end of the plan year before withdrawal. Thus, the Plan says, the original bill contemplated a "funding gap"—from the valuation date to the withdrawal date. Because the section providing that interest started accruing on the withdrawal date did not make it into the statute as en-

acted, the Plan argues, Congress expressly rejected the idea of a "gap."  Brief for Petitioner 41.

For the reasons stated above, see *supra*, at 426–427, we doubt that our reading, as a practical matter, will cause a significant gap to occur.  But, regardless, if we were to consider legislative history in this case, we would find that it undermines, rather than supports, the Plan's reading.  The Plan's rendering is incomplete, for the relevant statutory provisions went through not two but four versions:

    (1) the original bill, calling for a valuation on the last day of the year before withdrawal and for interest accrual beginning on the date of withdrawal,

> see S. 1076, 96th Cong., 1st Sess., § 104 (1979) (adding ERISA §§ 4201(d)(1)(A), (e)(5)), reprinted in 125 Cong. Rec. 9800, 9803 (1979); H. R. 3904, 96th Cong., 1st Sess., § 104 (1979) (adding ERISA §§ 4201(d) (1)(A), (e)(5)), reprinted in Hearings on the Multiemployer Pension Plan Amendments Act of 1979 before the Task Force on Welfare and Pension Plans of the Subcommittee on Labor-Management Relations of the House Committee on Education and Labor, 96th Cong., 1st Sess., pp. 3, 21, 25 (1979) (hereinafter Task Force Hearings);

    (2) a second version, which moved the valuation date to the end of the withdrawal year and also said that interest shall be determined "as if each payment were made at the end of the year in which it is due" (thus apparently indicating that interest would start accruing one year before the first payment fell due),

> see H. R. 3904, *supra*, § 104 (adding ERISA §§ 4201(e) (2)(E), (f)(2)(C), (f)(3)(A), (f)(4)(A), (i)(2)(A) (ii)), reprinted in Task Force Hearings 246–247, 249, 251, 252, 256;

    (3) a third version, which kept the valuation date at the end of the withdrawal year but changed the interest-

accrual language to the "as if" clauses found in the statute as we now know it,

> see H. R. 3904, 96th Cong., 1st Sess., § 104 (1980) (adding ERISA §§ 4201(e)(2)(E)(i), (f)(2)(C)(i), (f)(3)(A), (f)(4)(A), (i)(2)(A)(i)), reprinted in H. R. Rep. No. 96–869, pt. 1, pp. 12–15 (1980); H. R. 3904, 96th Cong., 1st Sess., § 104 (1980) (adding ERISA §§ 4201(e)(2)(E)(i), (f)(2)(C)(i), (f)(3)(A), (f)(4)(A), 4202(c)(1)(A)(i)), reprinted in H. R. Rep. No. 96–869, pt. 2, pp. 129–131, 135–136 (1980); and

(4) a final version, which moved the valuation date back to the end of the year preceding withdrawal but retained the third version's interest-accrual language,

> see H. R. 3904, 96th Cong., 1st Sess., § 104 (1980) (adding ERISA §§ 4211(b)(2)(E)(i), (c)(2)(C)(i)(I), (c)(3)(A), (c)(4)(A)(i), 4219(c)(1)(A)(i)), reprinted in 126 Cong. Rec. 23003, 23014, 23016 (1980).

This history suggests two things, neither of which helps the Plan. *First,* throughout the bill's history, the valuation date and interest-accrual date moved about in an apparently uncoordinated way. This somewhat undermines the Plan's suggestion that Congress was very concerned about the interplay between the two. It certainly dispels the notion that the final version should primarily be viewed as a rejection of the "funding gap" found in the original bill. *Second,* the evolution of the "as if" clause from "as if each payment were made at the end of the year in which it is due" to "as if the payment were made on the first day of the plan year [following withdrawal]" suggests that Congress replaced a scheme in which interest starts accruing a full payment cycle before the first payment with a scheme in which interest starts accruing on the first day of the year following withdrawal.

## III

We consequently hold that MPPAA calculates its installment schedule on the assumption that interest begins accruing on the first day of the year following withdrawal. The judgment of the Court of Appeals is therefore

*Affirmed.*