204 F.3d 736 (7th Cir. 2000)
 CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND and HOWARD MCDOUGALL, Plaintiffs-Appellants,
v.
HUNT TRUCK LINES, INC., an Iowa corporation, Defendant-Appellee.
CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND and HOWARD MCDOUGALL, Plaintiffs-Appellants,
v.
HUNT TRUCK LINES, INC., an Iowa corporation, Defendant-Appellee.
 Nos. 99-1273, 99-2385.
 In the United States Court of Appeals For the Seventh Circuit
 Argued October 27, 1999
Decided February 28, 2000
 
 Appeal from the United States District Court for the Northern District of Illinois, Eastern Division. No. 96 C 5634--John A. Nordberg, Judge.
 Appeal from the United States District Court for the Northern District of Illinois, Eastern Division. No. 98 C 6464--Milton I. Shadur, Judge. [Copyrighted Material Omitted]
 Before HARLINGTON WOOD, JR., FLAUM, and EVANS, Circuit Judges.
 TERENCE T. EVANS, Circuit Judge.
 
 
 1
 This appeal consolidates two cases arising out of Hunt Truck Lines' refusal to make withdrawal liability payments to Central States under ERISA's multiemployer pension plan provisions. In the first case, Judge John Nordberg found that Central States' admittedly premature fee assessment precluded the court from ordering Hunt to make interim payments on its withdrawal liability while the underlying fee assessment went through arbitration. In the second case, Judge Milton Shadur affirmed an arbitration award that assumed Hunt's liability but failed to provide for an enforceable money judgment. Central States believes these rulings leave it in an odd and unjust position: despite widespread agreement that Hunt owes withdrawal liability, Central States cannot collect. It asks that we right this wrong and force Hunt to finally pay the money it owes.
 
 
 2
 Since both halves of this appeal concern the Multiemployer Pension Plan Amendments Act of 1980 (MPPAA), 29 U.S.C. secs. 1381-1461, it makes sense to begin with a brief overview of the statute to put the facts that follow in context. The MPPAA arose out of Congress' fear that any time an employer withdrew from a multiemployer pension plan (MPP) under ERISA it could set off a domino effect that, "much like a bank run," could leave the MPP unable to pay its vested obligations. Artistic Carton Co. v. Paper Indus. Union- Management Pension Fund, 971 F.2d 1346, 1348 (7th Cir. 1992); accord Milwaukee Brewery Workers' Pension Plan v. Jos. Schlitz Brewing Co., 513 U.S. 414, 416-17 (1995). To correct this problem the statute provides that whenever a fund trustee determines that an employer has withdrawn, she can assess the employer "withdrawal liability" of an amount that roughly matches the employer's proportionate share of the plan's unfunded vested benefits. See Bay Area Laundry and Dry Cleaning Pension Trust Fund v. Ferbar Corp., 522 U.S. 192 (1997). The employer may contest the trustee's assessment but, to ensure that this will not affect the fund's ability to pay off its obligations, only an arbitrator can decide the merits of the challenge, and the employer must pay "interim withdrawal liability payments" until the arbitrator reaches a final decision. See id. Under this "pay now, dispute later" scheme, if the employer wins it recovers its interim payments; if not, the fund collects the remainder of the withdrawal liability. Robbins v. Pepsi-Cola Metro. Bottling Co., 800 F.2d 641, 642-43 (7th Cir. 1986). With this framework in place, we move on to the facts.
 
 
 3
 Central States is a multiemployer pension fund subject to ERISA. Hunt Truck Lines is a trucking firm that was obliged to contribute to the fund under a collective bargaining agreement.
 
 
 4
 In 1994 Hunt sold its assets to Wintz Parcel Drivers, Inc. and stopped making contributions to the fund. Ordinarily, this would require Hunt to pay a withdrawal fee. However, since the sale to Wintz satisfied the statutory requirements of 29 U.S.C. sec. 1384(a)(1)(C), Hunt avoided payment as long as Wintz made the required contributions. In other words, Hunt became secondarily liable--if Wintz withdrew and failed to pay a withdrawal fee, Hunt remained obligated to ante up for its own withdrawal liability.
 
 
 5
 On June 3, 1996, Hunt received a notice and demand from Central States requesting $303,372.75 in withdrawal liability. The fund claimed that Hunt's liability was triggered because Wintz had "effected a complete withdrawal." Hunt refused to pay and asked Central States to review its withdrawal liability assessment. Instead, the fund filed suit against Hunt demanding interim withdrawal liability payments. In response, Hunt commenced arbitration proceedings to contest the underlying fee assessment.
 
 
 6
 Cental States then filed a motion for summary judgment on its claim for the interim payments. The fund argued that because any dispute over the merits of a withdrawal assessment must be settled in arbitration, and 29 U.S.C. sec. 1401(d) mandates that a court order interim payments to an MPP pending the outcome of arbitration, it was entitled to collect. Hunt, in turn, filed a cross-motion for summary judgment. It asserted that since Cental States' "Statement of Material Facts to Which There Is No Material Issue" revealed that it sought withdrawal liability payments from Hunt before Wintz withdrew, and Hunt's secondary liability for the withdrawal payments could only be triggered after a Wintz withdrawal, the fund had no right to demand withdrawal liability payments when it did.
 
 
 7
 Before addressing these arguments, Judge Nordberg laid out the relevant dates. He first noted that both sides conceded that Hunt received Central States' demand on June 3, 1996. Deciding on the timing of Wintz' final withdrawal proved slightly more difficult. In its memo in support of summary judgment, Central States attested to the fact that Wintz withdrew "on or about July 20, 1996." But after Hunt seized upon this date to argue that it had been billed prematurely, the fund claimed that Wintz had actually withdrawn in May. Central States argued that this date was consistent with its prior filing because its "on or about" language was not sufficiently specific to tie the fund to the prior date. Judge Nordberg found this argument "unbelievable" and concluded that, based on their initial filings, both parties agreed to the basic time frame. He then settled on July 27, 1996, as the date for the Wintz withdrawal since the parties stipulated to that date in their arbitration proceedings.
 
 
 8
 With the dates set, Judge Nordberg turned to the question of whether Hunt was required to make interim withdrawal liability payments. Looking to the text of the MPPAA, the judge determined that the Act implicitly required that a plan sponsor could only issue notice of withdrawal liability after the event triggering liability occurred.[1] He then found that, because this requirement was a statutory prerequisite to bringing a lawsuit to recover withdrawal liability and Cental States billed Hunt before its liability came due, the fund could not collect interim payments. Judge Nordberg underlined that his decision was not based on Hunt's likelihood of success but, rather, on Central State's failure to fulfill the MPPAA's statutory requirements.
 
 
 9
 Meanwhile, back at the arbitration proceedings, arbitrator Ira Jaffe also concluded that Hunt had been billed prematurely. Nevertheless, he found that this did not require Central States to rescind its withdrawal liability assessment. Instead, he directed the fund to "revise the assessment to comport with Section 4204,[2] not to void the assessment and . . . begin anew the demand, request for review, and arbitration process." To this end, he ordered Central States "to issue a revised Demand, including a revised payment schedule, based upon the fact that Wintz did not miss a payment to the Fund until August, 1996."
 
 
 10
 Central States immediately sued to affirm and enforce this award, and Judge Shadur promptly granted its motion for summary judgment. Yet, despite this victory, at some point during the two weeks following Judge Shadur's decision Central States began to worry that its arbitration award did not specify that it recover any money. Thus, it filed a last- minute Rule 59(e) motion arguing that to truly enforce the arbitrator's award the court needed to modify its ruling and enter a money judgment.
 
 
 11
 Judge Shadur refused the request. He stated that the only question he was asked to decide was whether the award should be enforced, and that he answered the question affirmatively. To grant the fund's Rule 59(e) motion, according to Shadur, would require him to step beyond a simple endorsement of the award--a question he was not asked to decide and one that he did not think he could appropriately address on a Rule 59(e) motion.
 
 
 12
 Central States now appeals both Judge Nordberg's and Judge Shadur's summary judgment rulings, as well as Judge Shadur's denial of its Rule 59(e) motion. We will address each in turn.
 
 
 13
 We begin with the fund's challenge to Judge Nordberg's ruling. As this decision granted Hunt's motion for summary judgment, our review is de novo, and we resolve any factual disputes in the light most favorable to Central States, the nonmoving party. See Russo v. Health, Welfare & Pension Fund, 984 F.2d 762, 765 (7th Cir. 1993).
 
 
 14
 The fund believes that the MPPAA plainly forbids Judge Nordberg's ruling. Its argument works in three steps. First, it points to a section of the MPPAA stating that any dispute between an employer and a plan sponsor concerning a determination made under secs. 1381 through 1399 must be resolved through arbitration. 29 U.S.C. sec. 1401(a)(1). Second, it states that the statutory range of arbitrable issues involved in this case includes sec. 1383(a) (defining a complete withdrawal), sec. 1383(e) (defining the date of a complete withdrawal), and sec. 1384(a)(2) (establishing the liability of the seller of assets in an "exempt" asset sale). Finally, it cites a series of cases where we have held that once a plan sponsor has requested withdrawal liability payments, an employer must either pay the whole liability or make interim payments regardless of any pending dispute on the merits of the assessment. See, e.g., Trustees of Chicago Truck Drivers v. Central Transp., 935 F.2d 114, 118 (7th Cir. 1991). Adding together these steps, according to Central States, leads to the conclusion that Judge Nordberg blew it by sticking his nose into an issue that was reserved for arbitration and by failing to order the interim payments plainly called for under the statute.
 
 
 15
 Hunt does not so much respond to this argument as offer a defense of Judge Nordberg's reading of the MPPAA. Hunt begins by noting that all parties agree that under sec. 1384 it retained secondary liability to Wintz. It then contends that this section contains two conditions that needed to be fulfilled before it could be assessed a withdrawal fee: (1) Wintz had to withdraw; and (2) Wintz had to ignore Central States' request that it pay a withdrawal fee. 29 U.S.C. sec. 1384(a)(2). Hunt maintains that since the parties agreed that Wintz withdrew from the plan after Central States billed Hunt, the fund failed to make a statutorily valid assessment of withdrawal liability. Hunt acknowledges that if the dates were in dispute the case should have been decided by an arbitrator. But since all the facts were uncontested, Hunt believes that when Central States asked the court to enforce the statute it was well within the court's authority to determine that the fund had not sufficiently complied with the statute to obtain the interim payments. See Galgay v. Beaverbrook Coal Co., 105 F.3d 137, 140 (3d Cir. 1997) (deciding a different issue, but while laying out the mechanics of the MPPAA stating that "[o]ur jurisdiction is limited to ordering the employer to make interim payments once the pension fund has demonstrated that it complied with the statutory requirements for calculating liability and notifying the employer"); see also, e.g., Canario v. Lidelco, Inc., 782 F. Supp. 749, 753 (E.D.N.Y. 1992) (holding that notifying a withdrawing employer of its withdrawal liability is a statutory precondition to collecting interim payments).
 
 
 16
 As the parties frame the issue, choosing between these two arguments puts us in a lose-lose situation. If we find for Central States we would sanction a scenario whereby an MPP could declare that an employer had withdrawn because the Cubs lost, and if the employer refused to begin interim payments while it challenged the assessment, a court would be obliged to force it to pay liquidated damages and make interim liability payments that could not be recovered until the arbitration was complete. If we find for Hunt it would mean that every time an employer withdraws from a fund, it could frustrate the purpose of the MPPAA's "pay now, dispute later" system by forcing a court to address the merits of the trustee's assessment of the withdrawal date before interim liability kicks in.
 
 
 17
 Fortunately, we face no such dilemma. Because Judge Nordberg's opinion hinged on the parties agreement that Central States jumped the gun, we can endorse it without undercutting the statute's dispute resolution scheme. This becomes apparent when one considers what would happen if a similar case were to arise after we issued an affirmance of Judge Nordberg's decision. In such a case, the fund would merely have to plead that it assessed liability after the employer withdrew to ensure that the court would back off the underlying dispute, order interim withdrawal payments, and leave the contested issues to arbitration. How ever, if the fund could not honestly plead that it assessed the employer's liability after withdrawal, it could not enforce an assessment that was not envisioned by the statute. In sum, any disagreement on the face of the pleadings would cause the MPPAA to kick in in its current form full force.
 
 
 18
 Thus, since we can avoid reading the MPPAA to allow funds to arbitrarily assess withdrawal liability without undercutting the statute's dispute resolution mechanism, our choice becomes clear: if, as Judge Nordberg concluded, the underlying facts are undisputed, we must affirm; if they are contested, the MPPAA dictates a reversal.
 
 
 19
 As to this question, we again side with Judge Nordberg. Central States' effort to back away from its statement that "on or about July 20, 1996, Wintz effected a 'complete withdrawal'" is unpersuasive. Indeed, the fund never actually said that this statement was incorrect. Instead, it attempted to slip around the language by stating that the date of Wintz's withdrawal was the subject of a separate arbitration between Central States and Wintz. This fact is neither here nor there. If Hunt could have honestly pled that Wintz effected a complete withdrawal in May, it would have. Judge Nordberg correctly found that the parties agreed on the underlying dates.
 
 
 20
 We also note that in making this determination the court did not rely on the arbitrator's factual findings. While Judge Nordberg chose July 27th as the date of Wintz's complete withdrawal because the parties agreed to it in arbitration, he explained that the exact date was irrelevant so long as it occurred after Central States billed Hunt. Since there is no reason to question that he relied solely on the pleadings in determining the overall time frame, his referral to the arbitration proceeding was, at worst, harmless error.
 
 
 21
 Turning to Judge Shadur's rulings, we again begin by noting the appropriate standards of review. We assess the summary judgment decision de novo. Our review of the Rule 59(e) motion, however, looks only for abuse of discretion. Highlands Ins. Co. v. Lewis Rail Serv. Co., 10 F.3d 1247, 1249 (7th Cir. 1993).
 
 
 22
 Cental States asserts that it is heart- wrenchingly unjust that its victories in front of arbitrator Jaffe and Judge Shadur have not enabled it to collect. The fund argues that since Hunt failed to request arbitration as to the amount of the assessment, Hunt's withdrawal liability became fixed by the arbitrator's decision. It then contends that the award assumed that Hunt would have to pay this amount. Since Judge Shadur's judgment did not provide the fund with a mechanism to collect, it believes that he failed to give the arbitration proceeding the force of law-- a ruling that would violate both the MPPAA and case law holding that once a court confirms an arbitration award it should have the same effect as judgments rendered by courts. See, respectively, 29 U.S.C. sec. 1401(b)(3), and Parsons & Whittemore Alabama Mach. and Servs. Corp. v. Yeargin Constr. Co., 744 F.2d 1482, 1484 (11th Cir. 1984).
 
 
 23
 While it is true that the arbitrator's opinion assumed that Central States would eventually collect the withdrawal liability it originally assessed Hunt, it is not clear how the arbitrator thought this was going to happen. Arbitrator Jaffe's statements that the fund should not be required to "begin the assessment process anew" and his order that Central States issue a revised demand are at odds. Perhaps Jaffe merely meant that Central States could stick with its underlying liability assessments when it issued its renewed demand; perhaps he thought his order would require Hunt to immediately pay. We can't know. All we do know is that Jaffe's sole affirmative order was that Central States issue the demand.
 
 
 24
 Happily, that's all we need to know to handle the fund's appeal. Central States could have returned to the arbitrator to ask for a clarification of the demand before it went to court. It also could have raised its contention that the award necessarily included a money judgment in its pleadings. Instead, it went to court the day after the arbitrator's decision came down and simply asked that the award be affirmed. We have held that an arbitrator's findings of law should only be disturbed by a reviewing court if they appear to be arbitrary and capricious or otherwise not in accordance with the law. Joseph Schlitz Brewing Co. v. Milwaukee Brewery Workers' Pension Plan, 3 F.3d 994, 999 (7th Cir. 1993), aff'd, 513 U.S. 414 (1995). To suggest that Judge Shadur should have unilaterally changed the order is a lot of baloney. The fund got what it asked for.
 
 
 25
 Furthermore, Judge Shadur's denial of the fund's Rule 59(e) motion to amend the judgment did not amount to an abuse of discretion. Rule 59(e) allows a court to correct its own error. Since the judge was not wrong on the merits, he had nothing to correct.
 
 
 26
 Finally, we wish to make absolutely clear that, while Central States cannot recover on this appeal, our decision does not preclude future recovery. In fact, it appears certain that Central States will (and should) receive the full withdrawal fee to which it is entitled. As per arbitrator Jaffe's award, the fund has issued Hunt a renewed demand. Central States appears to be under the impression that either Judge Nordberg's or Judge Shadur's opinions preclude it from collecting on this second demand. This is not the case. Since both judges' rulings focused solely on the fund's prior, premature demand, Hunt should comply with the fund's later demand. (Indeed, it should already be complying.) If Hunt fails to pay on this demand, Central States need merely file suit under the MPPAA's enforcement scheme to ensure that it receives interim payments. This leaves only one question unsolved: Why didn't Central States save everyone a big headache and pursue this course of action a long, long time ago? Both judgments are AFFIRMED.
 
 
 
 Notes:
 
 
 [1]
 In making this determination Judge Nordberg relied on the following two sections of the MPPAA:
 Sec. 1381(a) If an employer withdraws from a multiemployer plan . . . then the employer is liable to the plan in the amount determined under this part to be the withdrawal liability.
 Sec. 1382 When an employer withdraws from a multiemployer plan, the plan sponsor, in accordance with this part, shall--
 1) determine the amount of the employer's withdrawal liability,
 2) notify the employer of the amount of the withdrawal liability, and
 3) collect the amount of the withdrawal liability from the employer. 29 U.S.C. secs. 1381(a) & 1382, respectively.
 
 
 [2]
 Codified at 29 U.S.C. sec. 1384.