In the
United States Court of Appeals
For the Seventh Circuit

No. 00-3922

Central States, Southeast and
Southwest Areas Pension Fund
and Howard McDougall,

Plaintiffs-Appellants,

v.

Hunt Truck Lines, Inc.,
an Iowa corporation,

Defendant-Appellee.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 96 C 5634--John A. Nordberg, Judge.

Argued May 14, 2001--Decided December 3, 2001


   Before Bauer, Rovner, and Diane P. Wood,
Circuit Judges.

   Diane P. Wood, Circuit Judge.  Prior to a
series of corporate sales and
bankruptcies, Hunt Truck Lines
participated in the Central States,
Southeast and Southwest Areas Pension
Fund. In 1996, Central States determined
that Hunt owed withdrawal payments to the
fund. It accordingly sent a notice
demanding that Hunt begin making interim
payments while the parties arbitrated
Hunt's ultimate liability. Hunt, however,
refused to pay. Central States responded
with this suit seeking the interim
payments. Despite the broad power pension
funds generally have to demand such
payments, the district court refused to
order Hunt to pay, finding that this was
one of those rare cases in which the fund
had exceeded its powers. In February
2000, a panel of this court affirmed that
decision. Central States, Southeast and
Southwest Areas Pension Fund v. Hunt
Truck Lines, Inc., 204 F.3d 736 (7th Cir.
2000) (Hunt I). Hunt then returned to the
district court to request attorneys'
fees, and the district court awarded it
over $100,000. Central States has
appealed that award, arguing that its
position in the underlying case was
substantially justified and that special

circumstances exist in this case that make an award of fees unjust. We agree with Central States and reverse the judgment of the district court.

I

In 1994, Hunt withdrew from the Central States pension fund. In many circumstances, this action would havegiven rise to withdrawal liability on Hunt's part under the relevant provisions of the Multiemployer Pension Plan Amendments Act of 1980, 29 U.S.C. sec.sec. 1381-1461 (MPPAA). Because Hunt sold its assets to another company, Wintz Parcel Drivers, Inc., however, the situation was morecomplicated. As long as Wintz continued to make payments to the fund, Hunt did not face withdrawal liability under the MPPAA. In 1996, one of Wintz's subsidiaries went bankrupt, which triggered withdrawal liability on Wintz's part under the relevant statutes. Central States first sent a notice to Wintz demanding that it begin making installment payments on the withdrawal liability, but Wintz defaulted. Its default permitted Central States to pursue Hunt's secondary liability for the withdrawal payments.

On May 31, 1996, Central States sent Hunt a notice demanding that it begin making installment payments on its withdrawal liability. Hunt refused, and Central States brought this lawsuit. At the same time, Central States commenced arbitration to determine Hunt's final liability.

The provisions of the MPPAA that give pension plans the right to demand interim payments of withdrawal liability are quite broad, and the general rule is that the plan is entitled to receive interim payments while the parties arbitrate the employer's ultimate withdrawal liability. See, e.g., Trustees of the Chicago Truck Drivers, Helpers and Warehouse Workers Union (Independent) Pension Fund v. Central Transp., Inc., 935 F.2d 114, 118 (7th Cir. 1991). There are very few exceptions to the plan's right to such payments, because the purpose of the interim payment provisions is to ensure that the plan is protected from the risk of insolvency and that it remain fully funded while the parties arbitrate their dispute. The statute mandating

arbitration of disputes over withdrawal liability would be thwarted if employers could litigate the merits of their claims before interim payments were made. See id. at 118-19. In most cases, therefore, when a plan seeks an order for interim payments, the district court enters the order as a matter of course.

This case proved to be an exception to that rule. In the district court, Hunt pointed out that Central States sent the notice and demand to Hunt on May 31, but that in its memorandum in support of summary judgment in the district court, Central States stated that Wintz withdrew from the plan "on or about July 20." Because Hunt could not have incurred withdrawal liability until Wintz actually withdrew from the plan, it was apparent that Central States had sent the notice to Hunt at least a month and a half before Hunt incurred any liability. Hunt argued that, although the provision for interim payments was broad, at a minimum the statute did not allow Central States to seek payments until after Hunt incurred withdrawal liability. Central States responded to this assertion in two ways. First, it argued that it thought the withdrawal might have occurred as early as May 3, and that since the date of withdrawal was disputed, that issue should be submitted to arbitration. In addition, Central States argued that, even if its notice was premature, it was clear that Wintz had withdrawn by the time Central States filed its complaint in the district court on September 5, and so the district court could order the interim payments despite the fact that the initial notice was premature.

The district court sided with Hunt, and a panel of this court affirmed that decision. Hunt I, 204 F.3d at 743. We rejected Central States' effort to argue that "on or about July 20" could mean "as early as May 3" and held instead that Central States would be bound by the admission it made in its summary judgment memorandum; this meant that the date of withdrawal was not legitimately in dispute. Id. at 742. We also ruled that, under the MPPAA, a pension fund was not permitted to issue a notice and demand for withdrawal liability until after the employer incurred such liability. Id. Because Central States did not comply with this statutory requirement, we agreed that Central States could not

collect interim payments based on the May 31 notice. Id.

Although Hunt prevailed on the narrow question presented, this court was careful to note that the decision would not preclude Central States from recovering the withdrawal payments once it issued a revised demand notice. In closing Hunt I, this court opined that "it appears certain that Central States will (and should) receive the full withdrawal fee to which it is entitled," and warned that "Hunt should comply with the fund's later demand." Id. at 743. Central States indeed filed a revised notice, quite promptly. Nevertheless, as of the date of oral argument in this case, Hunt had yet to pay a dime on the underlying liability.

Far from agreeing to pay what it owes, Hunt instead filed a number of motions in the district court seeking to have Central States pay Hunt for its attorneys' fees in litigating Hunt I. Hunt did prevail on the only issue it raised in the case, which was whether Central States could demand interim payments based on a premature notice of liability. There is a modest presumption in ERISA cases in favor of awarding attorneys' fees to the prevailing party, Meredith v. Navistar Int'l Transp. Corp., 935 F.2d 124, 128 (7th Cir. 1991), and the district court accordingly granted Hunt's fee petitions. Despite the presumption in favor of awarding fees in usual cases, however, we believe that the district court erred in failing to take into account the broader context of this litigation.

II

ERISA generally permits a district court to award attorneys' fees to either party in a dispute over withdrawal liability. 29 U.S.C. sec. 1132(g). This court has described the approach the district courts should take in determining whether to award fees in ERISA cases in two ways. The first looks to five factors that the court should consider in connection with the fee question: (1) the degree of the losing party's culpability or bad faith; (2) the ability of the losing party to satisfy an award of fees; (3) whether an award of fees against the losing party would deter others from acting under

similar circumstances; (4) whether the party requesting fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA; and (5) the relative merits of the parties' positions. Meredith, 935 F.2d at 128. The second approach indicates that the district court should award fees to the prevailing party unless either (1) the losing party's position was substantially justified or (2) special circumstances make a fee award unjust. Id. In the end, we think these two formulations are simply alternative ways of making the same basic point: as we have put it before, "the bottom-line question is . . . : was the losing party's position substantially justified and taken in good faith, or was that party simply out to harass its opponent?" Id. We review the district court's decision to award fees for abuse of discretion. Bowerman v. Wal-Mart Stores, Inc., 226 F.3d 574, 592 (7th Cir. 2000).

Here, in the broader context of this litigation, an award of fees would do nothing but encourage the very foot-dragging and avoidance of interim payment liability that the statute was designed to prevent, and thus would be "unjust." The district court apparently felt that it was without power to consider events not directly related to the case before it. This assumption was in error. Our cases make clear that a district court considering an award of fees should take into consideration any "special circumstances" which would make an award of fees unjust, see Meredith, 935 F.2d at 128, and that directive is broad enough to encompass consideration of pending, related litigation between the parties.

Once we take this broader context into account, it becomes clear why fees would be inappropriate here. Although Hunt won this round of its battle with Central States, as far as we can tell from the record, there is no dispute that Hunt will ultimately face withdrawal liability. Nevertheless, Hunt has continued to refuse to make payments to Central States, and as of the date of oral argument in this case had not paid anything. The fact that Hunt has now managed to put off making its first payment on its liability for several years confirms our suspicion that Hunt's

primary motivation in this case was not to force Central States to issue a new demand notice revising the withdrawal date by a few months (which Central States has long since done), but to delay paying its withdrawal liability for as long as possible. In the face of Hunt's obstinance, it would be unjust to require Central States to pay Hunt over $100,000. Given the fact that Hunt apparently is not financially stable and that Central States fears that, when it finally does receive an enforceable award against Hunt, Hunt will no longer be able to pay, the injustice of ordering an award at this stage is particularly acute.

We also conclude that the district court erred in concluding that Central States had no legitimate justification for its position in the underlying litigation and was pursuing the case in bad faith. The district court was understandably unimpressed with Central States' argument that when it said Wintz withdrew from the plan "on or about July 20," it might have meant as early as May 3. Perhaps that rather silly assertion detracted from the force of Central States' key point, which was that the legal question it was presenting was not so simple after all. The district court thought it clear under the relevant statutes that Central States had overstepped its bounds by trying to collect interim payments based on a premature demand notice. Noting that Central States still had the power to reissue a valid notice, the district court believed that an award of fees would serve as a deterrent to Fund attempts to skirt the statutory framework in the future. Finally, although the district court acknowledged that Central States was likely to prevail on the issue of Hunt's ultimate liability, it regarded that issue as relevant only to the related cases before other judges and not to the merits of the parties' positions in the case before it.

In fact, the issues that Central States was litigating were more complex than the district court acknowledged and its position was, even if not ultimately a winning one, substantially justified. In several cases prior to Hunt I, we stressed that under the MPPAA an employer is required to make interim payments at the fund's request in almost all cases. It therefore followed, we said, that we

would refuse to order interim payments only if the employer could show both (1) that the fund did not have even a colorable claim on the merits of its assessment of liability, and (2) that making the interim payments while the claim's merits were arbitrated would cause the employer irreparable harm. See Trustees of the Chicago Truck Drivers, Helpers and Warehouse Workers Union (Independent) Pension Fund v. Rentar Indus., Inc., 951 F.2d 152, 154-55 (7th Cir. 1991); Central Transp., 935 F.2d at 118-19.

In this case, Hunt never even attempted to show that it would suffer irreparable harm if it were required to make interim payments. Under Rentar Industries and Central Transport, Central States thus had a respectable argument that Hunt could not avoid an order for interim payments regardless of any problems with Central States' notice. Ultimately, of course, we determined that if a fund's demand for payments was facially defective, we would not inquire into the harm the company would suffer from making interim payments. Nevertheless, prior to Hunt I, we had never found any exceptions to the two-part rule of Rentar Industries and Central Transport. Under those circumstances, one could not say that Central States lacked a substantial justification for the argument it raised in reliance on these cases.

Central States also had a significant good-faith reason for taking the position it did. Central States operates a pension fund supported by contributions from multiple employers, and when an employer defaults on its obligations to the fund, Central States' ability to pay the promised pensions to its beneficiaries may be endangered. Nevertheless, as Central States' frequent resort to this court shows, employers who have withdrawn from the fund are often recalcitrant when it comes to paying withdrawal liability. See, e.g., Central States, Southeast and Southwest Areas Pension Fund v. Bomar Nat'l, Inc., 253 F.3d 1011 (7th Cir. 2001); Central States, Southeast and Southwest Areas Pension Fund v. Safeway, Inc., 229 F.3d 605 (7th Cir. 2000); Central States, Southeast and Southwest Areas Pension Fund v. Midwest Motor Express, Inc., 181 F.3d 799 (7th Cir. 1999). As we explained in Central

Transport, the fund's ability to collect interim payments while the parties arbitrate the employer's ultimate liability is a critical component of the MPPAA's statutory scheme. 935 F.2d at 118. Because many employers that have withdrawn from a fund are financially unstable, the interim payments provide the fund with a needed assurance that, in the event the employer is ultimately found liable, there will be funds available to cover the employer's liability. Id. Recognizing this need, Congress intentionally drafted the interim payment provisions of the MPPAA to give funds very broad power to demand interim payments, id., and the funds have an obligation to their constituents to try to keep that power as broad as required to meet the statutory purposes.

From the perspective of the employer, the difference between having to pay based on a premature notice and being able to wait until the fund issues a proper notice may be insignificant--a few months of payments at the most. Given the number of withdrawal liability notices the fund sends out in any given year, however, the delay in payment during those few months could quickly add up to substantial losses for the fund. In addition, although the district court found that there was no legitimate dispute over the appropriate withdrawal date in this case, withdrawal dates are often difficult to compute with precision, which means that the fund had a substantial interest in arguing for a rule that would not penalize it for occasional miscalculations. For these reasons, we believe Central States had a significant, good-faith reason for litigating this case.

Once it is established that Central States' position in this case was substantially justified and taken in good faith, the district court's concern that an award of fees was necessary to deter similar conduct by funds in future cases loses much of its force. Although Central States' position in this case was substantially justified, now that we have answered the legal question, a similar argument in a future case would lack merit.

In closing, we stress that we are not holding that an award of fees could never

be appropriate in an interim payments case. Rather, as we have repeatedly held, the district court must evaluate a fee request on the basis of all the circumstances of the case. In the unique circumstances of this case, however, we find that an award of fees to Hunt would be unjust, and that the district court accordingly abused its discretion in making that award. The judgment of the district court is Reversed.