**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

<table>
<tr>
<td>

BOARD OF TRUSTEES OF THE WESTERN STATES OFFICE AND PROFESSIONAL EMPLOYEES PENSION FUND,

<em>Plaintiff-Appellant</em>,

v.

WELFARE & PENSION ADMINISTRATION SERVICE, INC.,

<em>Defendant-Appellee.</em>

</td>
<td>

No. 20-35545

D.C. No. 3:19-cv-00811-SB

OPINION

</td>
</tr>
</table>

Appeal from the United States District Court
for the District of Oregon
Stacie F. Beckerman, Magistrate Judge, Presiding

Argued and Submitted October 5, 2021
Portland, Oregon

Filed January 31, 2022

Before: William A. Fletcher, Sandra S. Ikuta, and
Daniel A. Bress, Circuit Judges.

Opinion by Judge Ikuta

# SUMMARY[*]

## ERISA

The panel affirmed the district court's summary judgment in favor of the defendant in an ERISA action brought by a multiemployer pension plan, seeking a recalculation of defendant's annual withdrawal liability payments following its withdrawal from the plan.

When an employer withdraws from a multiemployer pension plan, it is required to pay for its share of unfunded benefits. That share, called withdrawal liability, may be paid in annual installments, calculated in part based on the "highest contribution rate" the employer was required to pay into the plan during a specified time period. In addition, when a multiemployer plan is underfunded and in critical status, the employer must pay a surcharge of five or ten percent of the total amount of contributions the employer was required to make to the plan each year.

The panel held that, for purposes of determining an employer's annual withdrawal payment, a surcharge paid by the employer when a plan is in critical status is not included in the calculation of the "highest contribution rate."

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Robert B. Miller, Kilmer Voorhees & Laurick PC, Portland, Oregon, for Plaintiff-Appellant.

Jeremy E. Roller, Arete Law Group PLLC, Seattle, Washington, for Defendant-Appellee.

**OPINION**

IKUTA, Circuit Judge:

Under Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001–1461, when an employer withdraws from a multiemployer pension plan, the employer is required to pay for its share of unfunded benefits. 29 U.S.C. § 1381. That share of unfunded benefits is called "withdrawal liability," *see id.*, and can be paid in annual installments, *see id.* § 1399(c)(1)(A)(i). The calculation of the employer's annual withdrawal payments is based in part on the "highest contribution rate" the employer was required to pay into the plan during a specified time period. *Id.* § 1399(c)(1)(C)(i)(II). Such a contribution rate is usually stated as dollars per compensable employee hour. A different section of ERISA provides that when a multiemployer plan is underfunded and in critical status, the employer is required to pay a surcharge of five or ten percent of the total amount of contributions the employer was required to make to the plan each year. *Id.* § 1085(e)(7)(A).

This appeal raises the question whether a surcharge paid by an employer when a plan is in critical status is included in the calculation of the "highest contribution rate" for purposes

of determining the employer's annual withdrawal payment. We hold it is not, and affirm the judgment of the district court.

I

This case involves an issue of statutory interpretation. An explanation of the relevant statutory framework is necessary to understand the parties' arguments.

In 1974, Congress enacted ERISA to "mak[e] sure that if a worker has been promised a defined pension benefit upon retirement—and if he has fulfilled whatever conditions are required to obtain a vested benefit—he actually will receive it." *Nachman Corp. v. Pension Ben. Guar. Corp.*, 446 U.S. 359, 375 (1980). To this end, "ERISA required employers to make contributions that would produce pension plan assets sufficient to meet future vested pension liabilities; it mandated termination insurance to protect workers against a plan's bankruptcy; and, if a plan became insolvent, it held any employer who had withdrawn from the plan during the previous five years liable for a fair share of the plan's underfunding." *Milwaukee Brewery Workers' Pension Plan v. Joseph Schlitz Brewing Co.*, 513 U.S. 414, 416 (1995).

In a multiemployer pension plan (*i.e.*, a plan created through an agreement among multiple employers and one or more unions), "[t]he contributions made by employers participating in such a multiemployer plan are pooled in a general fund available to pay any benefit obligation of the plan." *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.*, 508 U.S. 602, 605 (1993). Multiemployer pension plans "provide the participating employers with such labor market benefits as the opportunity

to offer a pension program (a significant part of the covered employees' compensation package) with cost and risk-sharing mechanisms advantageous to the employer." *Id.* at 606.

Multiemployer pension plans also give rise to distinctive risks. As ERISA was originally enacted, "the possibility of liability upon termination of a plan created an incentive for employers to withdraw from weak multiemployer plans." *Id.* at 608 (citing *Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211, 215 (1986)). When an employer withdrew from a plan before fully funding the benefits owed to its employees, the remaining employers were required to absorb the cost. *See Connolly*, 475 U.S. at 216 (citation omitted). "[T]his scheme encouraged an employer to withdraw from a financially shaky plan and risk paying its share if the plan later became insolvent, rather than to remain and (if others withdrew) risk having to bear alone the entire cost of keeping the shaky plan afloat." *Milwaukee Brewery*, 513 U.S. at 416–17. After one employer withdrew, the remaining employers had an increased incentive to withdraw as well, further imperiling the plan in a "vicious downward spiral." *Connolly*, 475 U.S. at 216 (citation omitted). In light of this risk, "a plan's financial troubles could trigger a stampede for the exit doors, thereby ensuring the plan's demise." *Milwaukee Brewery*, 513 U.S. at 417.

In 1980, Congress addressed this problem by amending ERISA to hold employers withdrawing from a multiemployer pension plan liable for their share of unfunded benefits. *See* Multiemployer Pension Plan Amendments Act ("MPPAA"), 29 U.S.C. §§ 1381–1461. Under the MPPAA, when an employer withdraws from a multiemployer pension plan, "the employer is liable to the plan in the amount determined under [the amendments] to be the withdrawal liability." 29 U.S.C.

§ 1381(a).  In imposing this liability for the employer's share of unfunded benefits, Congress sought "to discourage withdrawals *ex ante* and cushion their impact *ex post*."  *Bay Area Laundry & Dry Cleaning Pension Tr. Fund v. Ferbar Corp. of Cal., Inc.*, 522 U.S. 192, 201 (1997).

An employer's withdrawal liability is "the allocable amount of unfunded vested benefits" subject to various adjustments as determined by a complex formula.  29 U.S.C. § 1381(b).  An employer can satisfy its withdrawal liability by either paying a single lump sum or making a series of annual payments over a specified amortization period.  *See id.* § 1399(c)(1)(A)(i).

If the employer chooses to pay on an annual basis, the amount of each annual payment is determined by a different formula.  The annual withdrawal payment amount is the product of: (1) the "average annual number of contribution base units for the period of 3 consecutive plan years [during the 10 plan years preceding the employer's withdrawal] in which the number of contribution base units for which the employer had an obligation to contribute under the plan is the highest"; and (2) the "highest contribution rate at which the employer had an obligation to contribute under the plan during the 10 plan years" preceding the employer's withdrawal.  *Id.* § 1399(c)(1)(C)(i).[1]  A "contribution base

---

[1] 29 U.S.C. § 1399(c)(1)(C)(i) states:

Except as provided in subparagraph (E), the amount of each annual payment shall be the product of—

(I) the average annual number of contribution base units for the period of 3 consecutive plan years, during the period of 10 consecutive plan years

unit" is defined as "a unit with respect to which an employer has an obligation to contribute under a multiemployer plan." *Id.* § 1301(a)(11). "For example, an employer's contribution under a collective bargaining agreement may be based on a participant's hours of covered work."[2]      When the amortization period exceeds twenty years, the employer satisfies its withdrawal liability by making the first twenty annual payments. *See* 29 U.S.C. § 1399(c)(1)(B).

After addressing the problem of employer withdrawal by enacting the MPPAA, Congress subsequently enacted the Pension Protection Act of 2006 ("PPA"), 29 U.S.C. § 1085, to tackle the problem of helping "severely underfunded multiemployer pension plans recover," *Lehman v. Nelson*, 862 F.3d 1203, 1207 (9th Cir. 2017). This amendment to ERISA "requires plan actuaries for multiemployer plans to annually certify 'whether or not the plan is or will be in

----

ending before the plan year in which the withdrawal occurs, in which the number of contribution base units for which the employer had an obligation to contribute under the plan is the highest, and

(II) the highest contribution rate at which the employer had an obligation to contribute under the plan during the 10 plan years ending with the plan year in which the withdrawal occurs.

For purposes of the preceding sentence, a partial withdrawal described in section 1385(a)(1) of this title shall be deemed to occur on the last day of the first year of the 3-year testing period described in section 1385(b)(1)(B)(i) of this title.

[2]  *Glossary*, Pension Benefit Guaranty Corporation (last updated Sept. 21, 2021), https://www.pbgc.gov/glossary.

critical status for such plan year or for any of the succeeding 5 plan years' within ninety days of the start of the plan year." *Id.* (quoting 29 U.S.C. § 1085(b)(3)(A)(i)). A multiemployer pension plan is in "critical status" if it is less than 65 percent funded and meets certain other criteria. 29 U.S.C. § 1085(b)(2)(A). When a plan is in critical status, each employer who is "otherwise obligated to make contributions for the initial critical year" must pay a surcharge into the plan, calculated as a percentage of the employer's contributions required under a Collective Bargaining Agreement ("CBA") or other agreement. *Id.* § 1085(e)(7)(A). During the first year of critical status, the surcharge is five percent of the amount of contributions the employer is otherwise obligated to make. *Id.* For each succeeding critical year, the surcharge is ten percent of those contributions. *Id.* The surcharges "shall be due and payable on the same schedule as the contributions on which the surcharges are based." *Id.* § 1085(e)(7)(B). The surcharge terminates when a new CBA is adopted in accordance with a rehabilitation plan. *Id.* § 1085(e)(7)(C).

In 2014, Congress made another effort to help critically underfunded plans. In the Multiemployer Pension Reform Act of 2014 (MPRA), Pub. L. No. 113-235, 128 Stat. 2130, 2773–882 (2014), Congress again amended ERISA to allow a multiemployer pension plan to reduce pension benefits if the plan was projected to run out of money before all promised benefits are paid. These amendments to the MPPAA "apply to . . . surcharges the obligation for which accrue on or after December 31, 2014." MPRA § 109(c), 128 Stat. at 2792. Because the surcharge in this case accrued prior to this date, the parties agree that the MPRA does not apply to this dispute.

II

In 2007, Welfare & Pension Administration Service, Inc. (WPAS) entered into a CBA with Office and Professional Employees International Union Local No. 8, AFL-CIO (the Union) from January 1, 2007 to December 31, 2016. The CBA required WPAS to contribute to a multiemployer pension plan administered by the Board of Trustees of the Western States Office and Professional Employees Pension Fund (the Fund). In Article 12 of the CBA, WPAS agreed to be bound by the terms of the multiemployer pension plan and to "contribute on behalf of each regular full-time and each regular part-time employee covered by this Agreement, not to exceed thirty-seven and one half (37 1/2) hours in any one week." The article then sets out the following contribution rates:

> Section 12.1(a) Effective April 1, 2007, the Employer pension contribution rate will increase to $2.50 per compensable hour . . .

> Section 12.1(d) Effective April 1, 2010, the Employer pension contribution rate will increase to $2.95 per compensable hour . . .

> For the purpose of this Article, a compensable hour shall be defined as any time for which an employee has received compensation, including vacation, holidays, sick leave, jury duty, etc.

In 2009, the multiemployer pension plan administered by the Fund was determined to be in critical status, as defined in 29 U.S.C. § 1085(b)(2). This determination triggered the

automatic employer surcharge, meaning that each employer had an obligation to pay a surcharge of five or ten percent of the contributions the employer was required to make under the CBA. 29 U.S.C. § 1085(e)(7)(A). WPAS paid a 5 percent surcharge in 2009, and then a 10 percent surcharge each year thereafter, in addition to the contributions required by the CBA.

In 2016, WPAS withdrew from the multiemployer pension plan. Under § 1381, this made WPAS liable to the plan for the amount of withdrawal liability calculated under § 1391. Using the statutory formula, the Fund calculated WPAS's total withdrawal liability as $24,436,947.

As permitted under § 1399, WPAS elected to satisfy its withdrawal liability through annual withdrawal payments rather than in a lump sum. WPAS's decision required the Fund to calculate the amount of the annual withdrawal payments using the formula in § 1399(c)(1)(C)(i), which required the calculation of two numbers.[3] The Fund first had to calculate WPAS's highest "average annual number of contribution base units for the period of 3 consecutive plan years." *Id.* § 1399(c)(1)(C)(i)(I). Under WPAS's CBA, the "contribution base units" were the compensable hours of employees, because WPAS's contribution rate in the CBA was based on a specified dollar amount per compensable hour. The Fund determined that the relevant number of contribution base units was 296,213 annual compensable employee hours.

Second, the Fund had to calculate the "highest contribution rate at which the employer had an obligation to

---

[3] *See supra* at 6 n.1.

contribute under the plan during the 10 plan years" preceding WPAS's withdrawal. *Id.* § 1339(c)(1)(C)(i)(II). Although the highest contribution rate stated in Section 12.1 of the CBA was $2.95 per compensable hour (beginning April 1, 2010), the Fund determined that the relevant contribution rate was $3.245 per compensable hour. The Fund arrived at this number by taking ten percent of $2.95 ($.295) and adding it to $2.95. The Fund justified this approach on the ground that in 2010, WPAS was required under § 1085(e)(7) to pay a ten percent surcharge of its total contributions to the plan, because the plan was in critical status, *see* 29 U.S.C. § 1085(e)(7)(A). According to the Fund, paying a surcharge of ten percent of contributions is equivalent to paying a ten percent higher contribution rate. Therefore, the Fund reasoned, the contribution rate of $2.95 per compensable hour was actually $2.95 plus ten percent, or $3.245 per compensable hour. The Fund contends that under this formulation, $3.245 per compensable hour is the "highest contribution rate" that WPAS paid under the plan for purposes of calculating the annual withdrawal payment. Multiplying $3.245 by 296,213 compensable hours, the Fund concluded that WPAS's annual withdrawal payment was $961,211.

WPAS does not dispute that the number of contribution base units is 296,213 compensable hours. However, WPAS contends that its "highest contribution rate" was $2.95 per compensable hour, as stated in the CBA, and that the Fund erred in characterizing the surcharge imposed on WPAS under § 1085(e)(7) (because the plan was in critical status) as part of the contribution rate. If the Fund had calculated WPAS's annual withdrawal payment using $2.95 per compensable hour, WPAS argues, its annual withdrawal payment would be $873,828.

WPAS challenged the Fund's assessment by initiating an arbitration proceeding on July 10, 2018. The arbitrator found in favor of WPAS and issued a partial final award ordering the Fund to recalculate WPAS's annual withdrawal payment using a highest contribution rate of $2.95.

On May 24, 2019, the Fund filed a complaint to vacate the arbitrator's award in district court. The district court granted WPAS's motion for summary judgment, affirming the arbitrator's finding that WPAS's "highest contribution rate" was $2.95.[4]  The Fund timely appealed.

## III

We must decide whether the term "highest contribution rate," as used in the formula for calculating an employer's annual withdrawal payments, *see* 29 U.S.C. § 1399(c)(1)(C)(i)(II), includes the percent of the surcharge imposed on an employer when a multiemployer plan is in critical status, *see id.* § 1085.

---

[4] While courts' review of arbitration awards is typically governed by the Federal Arbitration Act, that act is not applicable here.  ERISA mandates arbitration for disputes regarding the calculation of an employer's annual withdrawal payment, *see* 29 U.S.C. § 1401(a)(1), and authorizes federal courts to review the arbitrator's decision and "enforce, vacate, or modify the arbitrator's award," *id.* § 1401(b)(2).  This language includes "the authority to decide de novo all issues of law . . ." *Bd. of Trs. of W. Conf. of Teamsters Pension Tr. Fund v. Thompson Bldg. Materials, Inc.*, 749 F.2d 1396, 1406 (9th Cir. 1984).  Because the underlying arbitration here was mandated by ERISA, its standards—and not those of the FAA—govern our review.

A

We start with the text of the statute, which provides a formula for determining an employer's annual withdrawal payment that includes "the highest contribution rate at which the employer had an obligation to contribute under the plan during the 10 plan years ending with the plan year in which the withdrawal occurs." *Id.* § 1399(c)(1)(C)(i)(II). Because the term "contribution rate" is not defined in the statute, we interpret these words according to "their ordinary, contemporary, common meaning." *Transwestern Pipeline Co., LLC v. 17.19 Acres of Prop. Located in Maricopa Cnty.*, 627 F.3d 1268, 1270 (9th Cir. 2010) (internal quotation marks omitted). The relevant dictionary definition of "rate" around the time § 1399 was enacted was "the amount, degree, etc. of anything in relation to units of something else." Webster's New World Dictionary, Third College Edition (1986). A specified dollar amount per compensable hour is a "rate" because it meets this definition. We consider these words "with a view to their place in the overall statutory scheme," *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 953 (9th Cir. 2009) (internal quotation marks omitted). In this case, the statute indicates that the definition of "contribution rate" is the rate imposed on the employer "under the plan." 29 U.S.C. § 1399(c)(1)(C)(i)(II). ERISA defines "plan" in relevant part as "an employee pension benefit plan." *Id.* § 1002(3). Article 12 of the CBA requires WPAS to contribute pursuant to the multiemployer plan, and describes the employer's "contribution rate" as dollar amount per compensable employee hour. Therefore, the most straightforward reading of § 1399(c)(1) is that the "highest contribution rate" is the highest dollar amount per compensable hour specified in the pension plan.

By contrast, the section for calculating the employer's surcharge, § 1085(e)(7)(A), refers to a "surcharge" that is a specified percentage of the contributions required by a plan. *See* 29 U.S.C. § 1085(e)(7) ("Each employer otherwise obligated to make contributions for the initial critical year shall be obligated to pay to the plan for such year a surcharge equal to 5 percent of the contributions otherwise required under the applicable collective bargaining agreement (or other agreement pursuant to which the employer contributes)."). The surcharge does not increase "the amount, degree, etc. of anything in relation to units of something else," and therefore does not constitute a rate or part of a rate. Instead, the surcharge required by § 1085 is imposed after the total amount of contributions has been determined (*i.e.*, after the dollar amount in the contribution rate has been multiplied by the total number of compensable hours). Rather than increasing the rate (the dollar amount per each hour) by ten percent, the surcharge requires a payment of ten percent of the total amount of contributions. *See id.*

Therefore, the surcharge automatically imposed on an employer when a plan is in critical status, *see id.*, does not increase the applicable contribution rate, which in this case is the dollar amount per compensable hours. In short, we join the well-reasoned opinion by the Third Circuit in concluding that the surcharge is not the "highest contribution rate" because it is not a "contribution rate" at all. *Bd. of Trs. of IBT Loc. 863 Pension Fund v. C & S Wholesale Grocers, Inc.*, 802 F.3d 534, 544–45 (3d Cir. 2015). Nothing in ERISA suggests that the imposition of a surcharge when a plan is in critical status increases the employer's contribution rate by ten percent. Accordingly, the "highest contribution rate" in this context means the highest dollar amount per compensable

hour that the employer is obligated to contribute under the plan,[5] here $2.95.

## B

The Fund advances several arguments to counter this interpretation.  The Fund argues that the surcharge imposed when a plan is in critical status, 29 U.S.C. § 1085(e)(7), must be included in WPAS's "highest contribution rate" for annual withdrawal liability, *see id.* § 1399(c)(1)(C)(i)(II), because the surcharge increases the contribution WPAS was required to make to the multiemployer plan.  This interpretation is contradicted by the language of the statute, which makes clear that the surcharge is not a contribution, let alone an increase to a contribution rate.

First, the section imposing a surcharge on employers when a plan is in critical status, *id.* § 1085(e)(7), distinguishes between the surcharge imposed on the employer by statute, and the contribution required by the plan.  For instance, § 1085(e)(7)(B) provides that surcharges are "due and

---

[5] The statute providing the calculation for the annual withdrawal penalty refers to "the highest contribution rate at which the employer had *an obligation to contribute* under the plan."        29 U.S.C. § 1399(c)(1)(C)(i)(II) (emphasis added).    The phrase "obligation to contribute" is defined to mean "an obligation to contribute arising—(1) under one or more collective bargaining (or related) agreements, or (2) as a result of a duty under applicable labor-management relations law." *Id.* § 1392(a).    Although the parties make various arguments regarding the meaning of the phrase "obligation to contribute," we do not need to address these arguments here.  Given our holding that the surcharge imposed under § 1085 when a plan is in critical status is not a "contribution rate" at all, the source of the employer's obligation to contribute to a multiemployer pension plan (whether the CBA or labor-management relations law) is not relevant.

payable *on the same schedule as* the contributions on which the surcharges are based." *Id.* (emphasis added). If the employer fails to pay the surcharge, it "shall *be treated as* a delinquent contribution." *Id.* (emphasis added). This language makes clear that the surcharge is based on the contribution, but is not itself deemed to be part of the contribution.

Second, even if the surcharge is considered part of the employer's contribution as a practical matter, the surcharge does not cause an increase in a "contribution rate." The Fund fails to point to any statutory language supporting its recharacterization of the surcharge as increasing the number of dollars owed (in the dollars-per-compensable-hour contribution rate set forth in the CBA) by ten percent. Indeed, ERISA undercuts the Fund's interpretation, because it expressly distinguishes between an employer's "contribution" to a multiemployer plan and the employer's "contribution rates." For example, in addressing the rules for additional funding when a plan is in critical status, the statute states that "[a]ny failure to make *a contribution under a schedule of contribution rates* provided under this subsection shall be treated as a delinquent contribution." *Id.* § 1085(e)(3)(C)(iv) (emphasis added). "[W]ere contributions the same as contribution rates, that provision would be redundant." *C & S Wholesale Grocers, Inc.*, 802 F.3d at 545. Because the surcharge is neither a contribution nor a contribution rate under the statute, it does not affect § 1399's formula for calculating annual withdrawal payments.

The Fund also argues that our interpretation is inconsistent with Congress's intent in enacting withdrawal liability provisions. The Fund relies on *Milwaukee Brewery Workers' Pension Plan v. Joseph Schlitz Brewing Co.*,

513 U.S. 414, which described the effect of the 1980 amendments adding the withdrawal liability provisions to ERISA. *Id.* at 417. According to *Milwaukee Brewery*, because "maintaining level funding for the plan is an important goal of" ERISA, the amendment "fixes the amount of each annual payment at a level that (roughly speaking) equals the withdrawing employer's typical contribution in earlier years." *Id.* at 418. The Fund argues that because our interpretation today results in an annual withdrawal payment that is ten percent lower than what the employer would make if it did not withdraw (because it does not include the surcharge for the plan being in critical status), our interpretation undermines Congress's intent in enacting the MPPAA.

The Fund's reliance on *Milwaukee Brewery* is misplaced, because it was decided eleven years before Congress enacted the amendment providing for a surcharge, and therefore did not consider the relationship between the annual withdrawal payments and the surcharge on employers when plans were in critical status. *Milwaukee Brewery* sheds no light on how the annual withdrawal payments and the surcharge for plans in critical status may interact. Indeed, the current version of ERISA contemplates that an employer's payments to multiemployer pension plans in critical status may decrease after the employer withdraws from the plan. *See* 29 U.S.C. § 1399(c)(1)(B) (extinguishing an employer's withdrawal liability after it makes 20 annual payments, even where these payments do not equal the total withdrawal liability).

The Fund also argues that ERISA requires us to infer that annual withdrawal payments include the surcharge for plans in critical status. The Fund notes that when Congress enacted the surcharge provisions in the 2006 PPA, it clarified that the

imposition of the surcharge on the employer would not affect the calculation of an employer's total withdrawal liability, which had been imposed in the MPPAA in 1980. *See* 29 U.S.C. § 1085(e)(9)(B) (2006) (providing that "[a]ny surcharges . . . shall be disregarded in determining an employer's withdrawal liability under section 1391 of this title," subject to certain exceptions).[6] But the 2006 PPA did not use similar language to clarify that the surcharge would not affect the calculation of an employer's annual withdrawal payments. Therefore, the Fund argues, we must infer that the annual withdrawal payment includes the surcharge. We reject this argument. In interpreting § 1399(c)(1)(C)(i), and its formula for calculating the annual withdrawal payment, we give effect to the statutory language, which was enacted in the 1980 MPPAA; we do not change our interpretation based on negative inferences that may be drawn from a subsequent amendment to ERISA in 2006. "Congress may amend a statute simply to clarify existing law, to correct a misinterpretation, or to overrule wrongly decided cases." *Hawkins v. United States*, 30 F.3d 1077, 1082 (9th Cir. 1994). We must not attempt to deduce the "intent behind one act of Congress from the implication of a second act passed years later." *Schrader v. Idaho Dep't of Health & Welfare*, 768 F.2d 1107, 1114 (9th Cir. 1985).

For the same reason, we reject the Fund's similar argument based on Congress's amendment of ERISA in the 2014 MPRA. The MPRA added the language the Fund notes is missing from the PPA: it expressly excluded the surcharge

---

[6] As effective December 16, 2014, this subsection reads: "Any surcharges . . . shall be disregarded in determining the allocation of unfunded vested benefits to an employer under Section 1391 of this title . . ." *See* 29 U.S.C. § 1085(g)(2) (2014).

from an employer's "highest contribution rate." 29 U.S.C. § 1085(g)(2).[7] According to the Fund, this change raises the inference that, prior to 2014, the surcharge was a part of an employer's contribution rate. Again, we conclude that this inference is unwarranted. *See Hawkins*, 30 F.3d at 1082; *Schrader*, 768 F.2d at 1114. Given that nothing in ERISA supports an interpretation that the surcharge is a component of a contribution rate, a more plausible inference is that Congress amended the statute to correct—once and for all—the type of misinterpretations urged by the Fund.[8]

**AFFIRMED.**

---

[7] 29 U.S.C. § 1085(g)(2) (effective December 2014) states:

(2) Surcharges

Any surcharges under subsection (e)(7) shall be disregarded in determining the allocation of unfunded vested benefits to an employer under section 1391 of this title and in determining the highest contribution rate under section 1399(c) of this title, except for purposes of determining the unfunded vested benefits attributable to an employer under section 1391(c)(4) of this title or a comparable method approved under section 1391(c)(5) of this title.

[8] The Fund also cites legislative history concerning the MPRA to supports its interpretation of ERISA as it existed prior to that amendment. Even if it were appropriate to examine legislative history in this case, "[p]ost-enactment legislative history (a contradiction in terms) is not a legitimate tool of statutory interpretation." *Bruesewitz v. Wyeth LLC*, 562 U.S. 223, 242 (2011). Therefore, we do not address these arguments.