[PUBLISH]

In the

# United States Court of Appeals

For the Eleventh Circuit

_____

No. 23-12533

_____

PERFECTION BAKERIES INC,

Plaintiff-Counter Defendant-Appellant,

*versus*

RETAIL WHOLESALE AND DEPARTMENT
STORE INTERNATIONAL UNION AND
INDUSTRY PENSION FUND,

Defendant-Counter Claimant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Alabama
D.C. Docket No. 2:22-cv-00573-ACA

_____

Before JORDAN, NEWSOM, and BRASHER, Circuit Judges.

NEWSOM, Circuit Judge:

On behalf of its employees in Michigan and Indiana, Perfection Bakeries paid into the Retail, Wholesale and Department Store International Union's Industry Pension Fund. It later stopped contributing to the Fund—first in Michigan, and then in Indiana. Each of these actions led Perfection to incur "withdrawal liability" under the Multiemployer Pension Plan Amendments Act of 1980. The Fund figured Perfection's withdrawal liability by applying a four-step formula set out in 29 U.S.C. § 1381. Perfection challenges the Fund's math—contending, specifically, that it performed a particular calculation at the wrong step. The district court granted summary judgment for the Fund, and Perfection now appeals. After carefully considering the issue, and with the benefit of oral argument, we affirm the district court's judgment.

## I

### A

We begin—necessarily—with a pretty tedious statutory primer.

The Multiemployer Pension Plan Amendments Act of 1980, 29 U.S.C. §§ 1381–1461, ensures "that an employer who withdraws from an underfunded multiemployer pension plan must pay a charge sufficient to cover that employer's fair share of the plan's unfunded liabilities." *Milwaukee Brewery Workers' Pension Plan v.*

*Joseph Schlitz Brewing Co.*, 513 U.S. 414, 415 (1995). To that end, the statute dictates that "an employer [who] withdraws from a multiemployer pension plan in a *complete withdrawal* or a *partial withdrawal* . . . is liable to the plan in the amount determined under this part to be the *withdrawal liability*." 29 U.S.C. § 1381(a) (emphasis added). A "complete withdrawal" occurs "when an employer—(1) permanently ceases to have an obligation to contribute under the plan, or (2) permanently ceases all covered operations under the plan." *Id.* § 1383(a). With some exceptions not relevant here, a "partial withdrawal" occurs when, "on the last day of a plan year . . . (1) there is a 70-percent contribution decline, or (2) there is a partial cessation of the employer's contribution obligation." *Id.* § 1385(a).

Section 1381(b) provides a four-step formula for calculating the employer's "withdrawal liability." Because it's so central to the case, we quote it here in full:

> (1) The withdrawal liability of an employer to a plan is the amount determined under section 1391 of this title to be the allocable amount of unfunded vested benefits, adjusted—
>
>> (A) first, by any de minimis reduction applicable under section 1389 of this title,
>>
>> (B) next, in the case of a partial withdrawal, in accordance with section 1386 of this title,
>>
>> (C) then, to the extent necessary to reflect the limitation on annual payments under section 1399(c)(1)(B) of this title, and

> (D) finally, in accordance with section 1405 of this
> title.

*Id.* § 1381(b)(1).  We will refer to § 1381(b)(1)'s four sequential adjustments—"first," "next," "then," and "finally"—as steps one, two, three, and four, respectively.

The nub of the dispute here is what happens at step two—which applies "in the case of a partial withdrawal" and which adjusts the calculation "in accordance with section 1386."  *Id.* § 1381(b)(1)(B).  Section 1386, in turn, does two things.  Subsection (a) prorates an employer's liability for a partial withdrawal to account for the fact that it isn't complete.  *See id.* § 1386(a) (stating that "[t]he amount of an employer's liability for a partial withdrawal, before the application of sections 1399(c)(1) and 1405 of this title, is equal to the product of" two numbers).

More importantly here, Subsection (b) provides a credit for employers who have incurred liability from a previous partial withdrawal—*i.e.*, what we'll call the "partial-withdrawal credit."  In relevant part, it says that:

> In the case of an employer that has withdrawal liability for a partial withdrawal from a plan, any withdrawal liability of that employer for a partial or complete withdrawal from that plan in a subsequent plan year shall be reduced by the amount of any partial withdrawal liability (reduced by any abatement or reduction of such liability) of the employer with respect to the plan for a previous plan year.

*Id.* § 1386(b)(1).

Though less central to this dispute, step three also warrants a brief explainer.  At that step, § 1381(b)(1)(C) applies "the limitation on annual payments under section 1399(c)(1)(B) of this title." Section 1399, in turn, gives employers two options for paying off their withdrawal liability: in a single lump sum or in annual installments.  *See id.* § 1399(c)(1), (c)(4).  The amount of each installment "(roughly speaking) equals the withdrawing employer's typical contribution in earlier years."  *Milwaukee Brewery*, 513 U.S. at 418; *see* 29 U.S.C. § 1399(c)(1)(C).  In other words, "the statute fixes the amount of each payment and asks how many such payments there will have to be."  *Milwaukee Brewery*, 513 U.S. at 418.  Importantly, though, the statute also imposes a 20-year cap, which limits an employer's liability to no more than 20 annual installment payments. See 29 U.S.C. § 1399(c)(1)(B).

Once a plan sponsor has run through all four steps and applied their prescribed adjustments, the statute instructs her to "notify the employer of"—and ultimately "collect"—"the amount of the withdrawal liability."  *Id.* § 1382.

**B**

Perfection Bakeries produces and distributes baked goods. Two of the company's facilities, one in Indiana and the other in Michigan, employed workers represented by the Retail, Wholesale and Department Store International Union.  At each location, a collective bargaining agreement required Perfection to contribute to the Union's Industry Pension Fund.

6                    Opinion of the Court                    23-12533

In 2016, Perfection stopped contributing to the Fund for its Michigan employees because it no longer had a contractual obligation to do so. The parties agree that Perfection's liability for that partial withdrawal amounted to $2,228,268.

Two years later, Perfection ceased its contributions for its Indiana employees, prompting the Fund to calculate the liability for the company's complete withdrawal. Relying on the Ninth Circuit's then-recent decision in *GCIU-Employer Retirement Fund v. Quad/Graphics, Inc.*, 909 F.3d 1214 (9th Cir. 2018), the Fund's actuary applied the partial-withdrawal credit at what we've called step two. The math worked as follows: At the time of Perfection's complete withdrawal, its allocable amount of unfunded vested benefits was $17,331,978. Perfection's partial-withdrawal credit, attributable to its earlier Michigan-based withdrawal, was $1,962,408.[1] After applying the partial-withdrawal credit at step two, Perfection's liability fell to $15,369,570. At step three, the Fund determined that the 20-year cap was $6,318,741, limiting Perfection's final withdrawal liability to that amount.

Perfection agreed with the amount of the partial-withdrawal credit, but it thought the Fund should apply that credit after completion of all other steps—*not* at step two. Under Perfection's preferred method, the Fund would have deducted the $1,962,408

---

[1] Perfection's $1,962,408 partial-withdrawal *credit* is less than its $2,228,268 partial-withdrawal *liability* because Pension Benefit Guaranty Corporation regulations require the plan sponsor to apply an amortization schedule to convert the employer's liability into the credit. *See* 29 C.F.R. §§ 4206.6, 4206.7.

23-12533               Opinion of the Court                    7

partial-withdrawal credit *after* the 20-year cap had cut the liability to $6,318,741—meaning that its final withdrawal liability would have been only $4,356,333.

## C

Objecting to the Fund's calculation, Perfection submitted the dispute to arbitration. *See* 29 U.S.C. § 1401(a)(1) (providing that "[a]ny dispute between an employer and the plan sponsor of a multiemployer plan concerning a determination made under sections 1381 through 1399 of this title shall be resolved through arbitration"). The arbitrator approved the Fund's computation, concluding that the Fund properly applied the partial-withdrawal credit at step two.

Perfection took its case to a federal district court, which it asked to modify or vacate the arbitration award and to order the Fund to recalculate the liability for the complete withdrawal. The Fund counterclaimed to enforce the award. Eventually, the district court granted summary judgment for the Fund. It held that the relevant statutory text "unambiguously requires the credit to be applied as part of the second potential adjustment"—that is, at step two. *Perfection Bakeries, Inc. v. Retail Wholesale & Dep't Store Int'l Union & Indus. Pension Fund*, No. 22-CV-573, 2023 WL 4412165, at *9 (N.D. Ala. July 7, 2023).

This is Perfection's appeal.

**II**

This case raises a single question of statutory interpretation: In calculating an employer's "withdrawal liability," when should one apply the partial-withdrawal credit?[2]  The Fund says at step two, and the district court agreed.  Perfection contends, by contrast, that the Fund should have applied the partial-withdrawal credit only after working through all four steps of § 1381(b)'s sequential formula.

"In determining the meaning of a statute, we look first to its language, giving the words used their ordinary meaning."  *Levin v. United States*, 568 U.S. 503, 513 (2013) (citation modified).  In other words, we "interpret the law as an ordinary person would."  *Tanzin v. Tanvir*, 592 U.S. 43, 52 (2020).  "We do not look at one word or term in isolation, but instead . . . to the entire statutory context."  *United States v. DBB, Inc.*, 180 F.3d 1277, 1281 (11th Cir. 1999).  "Our task is to interpret the statute as best we can, not to second-guess the wisdom of the congressional policy choice."  *Mansell v. Mansell*, 490 U.S. 581, 594 (1989).

---

[2] We review de novo both the district court's grant of summary judgment, *Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 767 (11th Cir. 2005), and its interpretation of the statute, *United States v. Milkintas*, 470 F.3d 1339, 1343 (11th Cir. 2006).  And under the MPPAA, de novo review applies to legal conclusions reached by the arbitrator.  *See Trs. of Cent. Pension Fund of Int'l Union of Operating Eng'rs & Participating Emps. v. Wolf Crane Serv., Inc.*, 374 F.3d 1035, 1039 (11th Cir. 2004) (distinguishing judicial review under the Federal Arbitration Act).

## A

This is a hard case. The statute is complex, and each party's interpretation has something going for (and against) it. Based on the statute's language and structure, though, we conclude that the Fund's reading is the better one, which means that it properly applied the partial-withdrawal credit at step two.

Section 1381 prescribes the four-step formula for converting the employer's allocable amount of unfunded vested benefits into "withdrawal liability." As already noted, the steps it lays out are expressly sequential: "first," "next," "then," "finally." 29 U.S.C. § 1381(b)(1)(A)–(D). Subsection 1381(b)(1)(B) outlines step two of that sequence, and it directs that the second adjustment be made "in accordance with section 1386 of this title." *Id.* § 1381(b)(1)(B). Section 1386, in turn, has two halves. The first applies to what we'll call "current" partial withdrawals—it provides the liability equation when an employer's withdrawal is partial rather than complete. *See id.* § 1386(a). More importantly here, the second applies to what we'll call "previous" partial withdrawals—further reducing an employer's liability "by the amount of any partial withdrawal liability . . . of the employer with respect to the plan for a previous plan year." *Id.* § 1386(b)(1).

Significantly, Subsection 1381(b)(1)(B) refers on its face to *all* of "section 1386"—not just half of it. Accordingly, by its plain terms, step two incorporates Subsection 1386(b)'s credit for previous partial withdrawals just as much as Subsection 1386(a)'s proration for current partial withdrawals.

Other textual clues further indicate that all of § 1386—including the credit for a previous partial withdrawal—should be brought to bear at step two. In describing step three, Subsection 1381(b)(1)(C) conspicuously directs that the 20-year cap be applied according to "section 1399*(c)(1)(B)* of this title." *Id.* § 1381(b)(1)(C) (emphasis added). That specification of a single sub-sub-subsection indicates, on balance, that step two's incorporation of *all* of "section 1386" was intentional. What's more, step three also refers back to § 1386 in its entirety: Before applying the 20-year cap, the provision requires a plan sponsor to adjust the employer's liability "first under section 1389 of this title and then under section 1386 of this title." *Id.* § 1399(c)(1)(A)(i). The same goes for step four. Section 1405—to which § 1381(b)(1)(D) refers—states that its potential reduction comes into play only "after the application of all sections of this part having a lower number designation than this section." 29 U.S.C. § 1405(a)(1). The text thus requires "application" of all of § 1386—the entirety of which is a "section" with a "lower number designation" than § 1405—before step four.

Throughout the four-step formula, then, the relevant provisions refer repeatedly to all of § 1386 as part of step two. Taken together, these cross-references confirm what the statute's four-step structure indicates: that the partial-withdrawal credit should be applied at step two—not as its own tacked-on, extratextual step *five*.[3]

---

[3] In reaching that conclusion, we join the unanimous Ninth Circuit panel in *GCIU*—the only other circuit to have decided this issue. Like we do today, the

23-12533                Opinion of the Court                11

## B

Perfection advances several counterarguments, none of which persuades us.

### 1

Perfection notes that Subsection 1386(b)(1) applies the partial-withdrawal credit to "withdrawal liability"—not the allocable amount of unfunded vested benefits. *See* 29 U.S.C. § 1386(b)(1). Perfection contends that "[b]ecause the credit reduces 'withdrawal liability,' and 'withdrawal liability' does not exist until after the four necessary adjustments have been applied to the allocable amount of unfunded vested benefits, the credit cannot be applied until that process is finished." Br. of Appellant at 28–29 (citations omitted); *accord* Dissenting Op. at 11–12.

Perfection is right that the statute defines "withdrawal liability" as "the amount determined" by the four-step formula. 29 U.S.C. § 1381(a). But the same provision also says that "withdrawal liability" is the "amount" for which the employer "is liable to the plan." *Id.* And that presents a problem for Perfection's reading:  If the partial-withdrawal credit isn't deducted until *after* the completion of the four-step process, then the process doesn't yield the "amount" for which the employer "is liable to the plan"—or

---

Ninth Circuit held that § 1381's four-step structure and its repeated references to all of § 1386 dictated that the partial-withdrawal credit be deducted at step two. *See GCIU*, 909 F.3d at 1218.

that the plan sponsor must ultimately "collect." *See id.* §§ 1381(a), 1382(3).[4]

Other parts of the statute further undermine Perfection's contention that only the final sum counts as withdrawal liability, with all interim amounts being mere adjustments to the allocable amount of unfunded vested benefits. At step two, Subsection 1386(a) provides that "[t]he amount of an employer's *liability* for a partial withdrawal, before the application of sections 1399(c)(1) and 1405 of this title, is equal to" the proration calculation. *See id.* § 1386(a) (emphasis added). And at step three, § 1399 similarly states that "the employer's *liability* shall be limited to the first 20 annual payments." 29 U.S.C. § 1399(c)(1)(B) (emphasis added).

Both provisions show that the statute references the employer's liability—*not* the allocable amount of unfunded vested benefits—even while it's in the process of being calculated. And that conforms with common sense and usage. After all, one might

---

[4] The dissent counters that "[s]everal other sections of the statute expressly reduce or change 'withdrawal liability' *after* the plan sponsor fully applies the four steps in section 1381," pointing specifically to §§ 1387 and 1388. Dissenting Op. at 17–18; *see* 29 U.S.C. §§ 1387, 1388. It's a good point—§ 1381 doesn't expressly name those other sections. But we don't think that means they aren't folded into the four-step process. As § 1405 makes clear, step four applies only "after the application of all sections of this part having a lower number designation than this section." 29 U.S.C. § 1405(a)(1). By its plain terms, that includes §§ 1387 and 1388. In any event, our task here isn't to pinpoint §§ 1387 or 1388's location but to identify the partial-withdrawal credit's proper place. Based on the statute's structure and multiple cross-references, we think it's step two.

well call something a cake even while it's still in the oven and before it's fully baked. *Cf. Bondi v. VanDerStok*, 145 S. Ct. 857, 868 (2025) ("An author might invite your opinion on her latest *novel*, even if she sends you an unfinished manuscript. A friend might speak of the *table* he just bought at IKEA, even though hours of assembly remain ahead of him.").

**2**

Perfection also gestures toward step two's introductory phrase, which directs the plan sponsor to apply § 1386 "in the case of a partial withdrawal." *Id.* § 1381(b)(1)(B). On Perfection's reading, this preface signals that step two includes only Subsection 1386(a)'s proration for current partial withdrawals, *not* Subsection 1386(b)'s credit for previous partial withdrawals. To bolster that interpretation, Perfection highlights that Subsection 1386(a) doesn't mention Subsection 1386(b), providing instead that its adjustment for current partial withdrawals occurs "before the application of sections 1399(c)(1) and 1405 of this title." *See id.* § 1386(a). As Perfection sees it, this omission means that the partial-withdrawal credit doesn't belong at step two.

To be sure, Perfection's reading of "in the case of a partial withdrawal" might initially seem to be the more "natural" one. *See* Dissenting Op. at 13. But that alone isn't enough to overcome the surrounding statutory context. After all, Subsection 1381(b)(1)(B) expressly incorporates *all* of § 1386, and so do steps three and four.[5]

---

[5] The dissent contends that its interpretation also "applies *all* of section 1386 at the same time when the initial partial withdrawal occurs." Dissenting Op.

14                   Opinion of the Court                   23-12533

These repeated and unqualified references to the partial-withdrawal credit outweigh Subsection 1386(a)'s failure to mention it—especially because that supposed omission may simply reflect the fact that many employers won't have any credit from a previous partial withdrawal. Section 1386's language also indicates—even if only indirectly—that the phrase "in the case of a partial withdrawal" is shorthand for both of its halves. In words that parallel Subsection 1381(b)(1)(B)'s preface, Subsection 1386(b)(1) states that the credit applies "[i]n the case of an employer that has withdrawal liability for a partial withdrawal from a plan." *Id.* § 1386(b)(1). In short, our reading is consistent with the textual snippets on which Perfection relies, while Perfection's interpretation would ask us to ignore the fact that the statute seems clearly to embed all of § 1386 at step two.

**3**

Perfection further insists that applying the partial-withdrawal credit at step two would frustrate the operation of step three's 20-year cap. Understanding Perfection's argument requires

---

at 16. On its read, "Subsection (a) tells the plan sponsor how to calculate that year's partial withdrawal liability . . . and subsection (b) tells it to book a credit in the amount of that year's partial withdrawal liability against any withdrawal liability in a 'subsequent' plan year." *Id.* Respectfully, we disagree. Subsection (b) says that the thing that reduces an employer's liability "in a subsequent plan year" is "the amount of any partial withdrawal liability . . . for a *previous* plan year." 29 U.S.C. § 1386(b)(1) (emphasis added). In other words, § 1386(b) isn't fully future-facing, but instead contemplates that the partial-withdrawal credit from "a previous plan year" be deducted at step two. That's exactly what the Fund did.

a brief recap. At step two of the Fund's calculation, the partial-withdrawal credit reduced Perfection's liability from $17,331,978 to $15,369,570. The 20-year cap cut that number to $6,318,741, which was Perfection's final withdrawal liability. As Perfection correctly points out, the 20-year cap would have yielded the same outcome even without prior application of the partial-withdrawal credit, whereas applying the credit *after* the 20-year cap would have further reduced Perfection's liability to $4,356,333.

It's true that in Perfection's case the 20-year cap gobbled up the partial-withdrawal credit. That's mainly because the 20-year cap operates independently of the other adjustments. To repeat, the cap is the sum of 20 annual payments that "(roughly speaking) equal[] the withdrawing employer's typical contribution in earlier years." *Milwaukee Brewery*, 513 U.S. at 418; *see* 29 U.S.C. § 1399(c)(1)(C). And that cap certainly redounded to Perfection's benefit, reducing its liability by nearly $10 million.

But Perfection exaggerates when it asserts that the Fund's reading renders the partial-withdrawal credit "illusory." *See* Br. of Appellant at 54. The partial-withdrawal credit can still have substantive bite even at step two—for example, when it reduces an employer's withdrawal liability below the 20-year cap. The statute also contemplates situations in which the 20-year cap doesn't apply, like mass withdrawals. *See* 29 U.S.C. § 1399(c)(1)(D). In short,

Perfection's complaint about its own case doesn't translate to every circumstance, let alone change what the statute says.[6]

Boiled to its essence, Perfection's argument is an appeal to purpose. Perfection contends that the Fund's reading undermines "the purpose of the credit, which is that 'the liability for any complete or partial withdrawal in a subsequent year' should 'properly reflect[] the employer's share of liability with respect to the plan." Br. of Appellant at 54 (quoting 29 U.S.C. § 1386(b)(2)). But nothing in the statute's language persuades us that the partial-withdrawal credit and 20-year cap have no overlap. In both its structure and repeated cross-references, the statute counsels that the partial-withdrawal credit belongs at step two.

### 4

Finally, Perfection appeals to guidance from the Pension Benefit Guaranty Corporation, to which § 1386 assigns a rulemaking role. *See* 29 U.S.C. § 1386(b)(2); *see also* Dissenting Op. at 15–16. In an opinion letter published within a few years of the statute's enactment, the Corporation interpreted the statutory scheme in Perfection's preferred manner—that is, to require the partial-withdrawal credit to be deducted after § 1381's four adjustments. *See* Pension Benefit Guar. Corp., Opinion Letter 85-4 (Jan. 30, 1985), https://www.pbgc.gov/sites/default/files/85-4.pdf

---

[6] In other words, our reading of the statutory language doesn't lead to an absurd result—one "where a rational Congress could not conceivably have intended the literal meaning to apply." *United States v. Pate*, 84 F.4th 1196, 1205 n.3 (11th Cir. 2023) (en banc) (citation modified).

23-12533                Opinion of the Court                17

[https://perma.cc/48TS-UT5S].   The agency's reasoning maps onto Perfection's core argument in contending that the credit "is an adjustment to withdrawal liability, i.e. a further adjustment to the [§ 1381] amount," and, therefore, "must be made after the employer's subsequent withdrawal liability is calculated in accordance with [§ 1381]." *Id.*

The Corporation's views merit respect to the extent they have the "power to persuade"—but they have no "power to control." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 402 (2024) (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).   The agency's reasoning doesn't move the needle here because it merely echoes (or more accurately, anticipated) Perfection's main arguments, which we have rejected as unpersuasive. *See supra* at 11–16. The Corporation's guidance can't convert a losing position into a winning one.

★  ★  ★

By any measure, this is a tough case.  The statute is complex, and both parties make plausible arguments.  Neither reading is perfect, but we conclude that the Fund's is better.  The statute's language and structure counsel that the partial-withdrawal credit's proper home is in step two.  To repeat, in cases like this one, our charge "is to interpret the statute as best we can, not to second-guess the wisdom of the congressional policy choice." *Mansell*, 490 U.S. at 594.  Having done so, we rule in the Fund's favor.

18                     Opinion of the Court                 23-12533

## III

We **AFFIRM** the district court's grant of summary judgment.

23-12533                JORDAN, J., Concurring                    1

JORDAN, Circuit Judge, Concurring:

This is a difficult case. After much back and forth, I am persuaded that Judge Newsom's approach is the better one, and I join the majority opinion in full. Neither reading of the statutory language is perfect, but the Fund's interpretation is more persuasive. Though I have some residual doubts about the correct answer, they are not sufficient to create a circuit split. *See Pub. Health Tr. of Dade Cnty. v. Lake Aircraft, Inc.*, 992 F.2d 291, 295 n.4 (11th Cir. 1993) ("We do not create intercircuit splits lightly. When another circuit has ruled on a point, we often follow it (even if we have some doubt about its correctness) unless we believe the decision to be plainly wrong."); *Nationwide Mut. Ins. Co. v. Barrow*, 29 F.4th 1299, 1306 (11th Cir. 2022) (Jordan, J., concurring) ("I have my doubts about the result in this case, but they are not strong enough to advocate that we create a circuit split[.]").

23-12533                BRASHER, J., Dissenting                1

BRASHER, Circuit Judge, dissenting:

I agree with the majority opinion that "[t]his is a hard case" and "each party's interpretation has something going for (and against it)." But I disagree that the majority opinion has picked the best interpretation as between the two.

This appeal turns on two terms used in the Multiemployer Pension Plan Amendments Act of 1980: "unfunded vested benefits" and "withdrawal liability." When an employer withdraws from an underfunded pension plan, the law requires it to pay "withdrawal liability"—i.e., the employer's "fair share of the plan's underfunding"—into the pension fund. *Milwaukee Brewery Workers' Pension Plan v. Joseph Schlitz Brewing Co.*, 513 U.S. 414, 416 (1995); s*ee also* 29 U.S.C. § 1381(a). To determine that "withdrawal liability," the statute starts with the plan's "unfunded vested benefits" allocable to the employer. *See* 29 U.S.C. § 1391. Then, the statute adjusts that amount in four sequential steps to determine "withdrawal liability." 29 U.S.C. § 1381(b).

The second step in determining "withdrawal liability" provides that, "in the case of a partial withdrawal," the "unfunded vested benefits" should be modified "in accordance with section 1386 of this title." *Id.* § 1381(b)(1)(B). Section 1386 has two subsections. Subsection (a) provides instructions to determine partial withdrawal liability as a percentage of an employer's overall obligations and then refers the reader back to complete steps three and four. 29 U.S.C. § 1386(a). Subsection (b) says that, when "an employer . . . has withdrawal liability for a partial withdrawal from a

plan," any "withdrawal liability . . . from that plan in a subsequent plan year shall be reduced by the amount of any partial withdrawal liability." 29 U.S.C. § 1386(b)(1).

Perfection Bakeries says that a pension plan should apply these provisions as follows. In the year that an employer partially withdraws from a plan—*i.e.* "in the case of a partial withdrawal"—the plan takes two actions under section 1386. First, it applies subsection (a) to determine the amount of the employer's partial withdrawal liability for that year before referring back to step three and step four. Second, it references subsection (b) to book a credit in the amount of that year's partial withdrawal liability against any future "withdrawal liability . . . from that plan in a subsequent plan year." If, at some point in the future, the employer withdraws from the plan again, the plan sponsor applies the credit against that employer's withdrawal liability for that subsequent plan year.

The Fund's actuary originally followed this practice in this case. The only reason that the Fund's actuary changed his mind and applied subsection 1386(b) differently—on his second attempt—is because of an intervening decision from the Ninth Circuit. In *GCIU-Employer Retirement Fund v. Quad/Graphics, Inc.*, 909 F.3d 1214, 1218 (9th Cir. 2018), the court held that the reduction provided by subsection 1386(b) applies at step two of section 1381 in the year of the subsequent withdrawal liability—even when a plan sponsor is calculating complete withdrawal liability—and reduces whatever figure is calculated after applying step one of section 1381 to the "unfunded vested benefits." The Ninth Circuit's

23-12533              BRASHER, J., Dissenting                   3

reasoning is sparse and unpersuasive. Although the court recognized that "[t]he § 1386(b) prior partial withdrawal credit reduces the employer's complete withdrawal liability," *id.*, it did not address the fact that "withdrawal liability" is a defined term. *See* 29 U.S.C. § 1381(b)(1). The court also failed to address the ordinary meaning of "in the case of a partial withdrawal" or any of the statutory context.

To its credit, the majority opinion does not adopt the Ninth Circuit's analysis or lack thereof. But I don't find the majority opinion's attempt to justify the same result any more persuasive. In my view, the Fund's reading cannot be squared with three parts of the statute's text: (1) step two in section 1381 is implicated only when we are calculating liability "in the case of a partial withdrawal," (2) "withdrawal liability" is a defined term that means something different than "unfunded vested benefits," and (3) the defined term "withdrawal liability" is what must be "reduced" by the credit in subsection 1386(b). Accordingly, I respectfully dissent.

## I.

I'll start with an overview of the statutory framework because it provides the context for this dispute. I'll then turn to the facts that led to the parties' two competing interpretations.

### A.

The Multiemployer Pension Plan Amendments Act of 1980, 29 U.S.C. §§ 1381–1461, establishes an employer's withdrawal liability from a multiemployer pension plan. Before that statute, if a

pension plan became insolvent, the law held only those employers who withdrew from the plan in the "previous five years liable for a fair share of the plan's underfunding." *Milwaukee Brewery*, 513 U.S. at 416; *see also* 29 U.S.C. § 1364. That scheme motivated employers to exit early from underfunded plans in hopes of avoiding liability. *See Milwaukee Brewery*, 513 U.S. at 417. But then the statute, as amended, eliminated those strategic decisions by "impos[ing] a withdrawal charge on all employers withdrawing from an underfunded plan." *Id.*

Under the statute, an employer can completely or partially withdraw from a plan. A "complete withdrawal . . . occurs when an employer (1) permanently ceases to have an obligation to contribute under the plan, or (2) permanently ceases all covered operations under the plan." 29 U.S.C. § 1383(a). With some exceptions, a "partial withdrawal" occurs when, "on the last day of a plan year . . . (1) there is a 70-percent contribution decline, or (2) there is a partial cessation of the employer's contribution obligation." *Id.* § 1385(a). As soon as practicable after a complete or partial withdrawal, the plan sponsor is supposed to notify the employer of the amount of its liability to the plan and a schedule for its liability payments. *Id.* § 1399(b)(1).

Section 1381 tells a plan sponsor to calculate the employer's liability, "in a complete withdrawal or a partial withdrawal," as the "amount determined under this part to be the withdrawal liability." 29 U.S.C. § 1381(a). The statute says that "withdrawal liability . . . is the amount determined under section 1391 of this title to be the

23-12533                BRASHER, J., Dissenting                5

allocable amount of unfunded vested benefits, adjusted" by four sequential steps. *Id.* § 1381(b)(1). So, to arrive at withdrawal liability, the plan sponsor starts with a calculation of the "unfunded vested benefits" allocable to the employer. *See id.* § 1391. Then, the plan sponsor adjusts that amount in four steps. *See id.* § 1381(b)(1)(A)–(D).

Each of these four sequential adjustments, listed chronologically, cross-references another section. "[F]irst," the statute directs the plan sponsor to adjust the employer's allocable amount of unfunded vested benefits "by any de minimis reduction applicable under section 1389 of this title." *Id.* § 1381(b)(1)(A). "[N]ext," the statute directs the plan sponsor, "in the case of a partial withdrawal," to adjust the value resulting from the first step "in accordance with section 1386 of this title." *Id.* § 1381(b)(1)(B). "[T]hen," the statute directs the plan sponsor to apply the third adjustment "to the extent necessary to reflect the limitation on annual payments under section 1399(c)(1)(B) of this title." *Id.* § 1381(b)(1)(C). "[F]inally," the statute directs the plan sponsor to make the adjustment "in accordance with section 1405 of this title." *Id.* § 1381(b)(1)(D). This final adjustment applies in situations where an employer sells all its assets to a third party or liquidates or dissolves.

The parties' dispute turns on the second step, which references section 1386. The title of section 1386 is "Adjustment for partial withdrawal; determination of amount; reduction for partial withdrawal liability; procedures applicable." It has two main subsections that match the title description. Subsection 1386(a) adjusts

6                    BRASHER, J., Dissenting                    23-12533

an employer's partial withdrawal liability to account for the fact that it is not complete. Subsection 1386(b) provides a reduction against the withdrawal liability of an employer in a subsequent year by the amount of its current partial withdrawal liability:

> In the case of an employer that has withdrawal liability for a partial withdrawal from a plan, any withdrawal liability of that employer for a partial or complete withdrawal from that plan in a subsequent plan year shall be reduced by the amount of any partial withdrawal liability (reduced by any abatement or reduction of such liability) of the employer with respect to the plan for a previous plan year.

*Id.* § 1386(b)(1).

The third step, although not central to the dispute, explains why the parties are litigating. Simply put, this step limits an employer's liability to no more than twenty annual payments. Subsection 1399(c)(1)(B) results in an employer, except in cases of mass withdrawals, paying the lesser of (1) the twenty-year cap or (2) the amount "determined under section 1391" as adjusted by the first two steps of section 1381. If the latter value exceeds twenty years, then the employer's liability "shall be limited to" the first twenty annual payments determined under subsection 1399(c)(1)(C). This limitation is colloquially referred to as "the twenty-year cap." And the practical effect of the statute's subsection 1399(c)(1)(B) lesser-of payment structure is that, in some cases, "employers may not fully refund a pension plan." *Trustees of Loc. 138 Pension Tr. Fund v. F.W. Honerkamp Co. Inc.*, 692 F.3d 127, 135 (2d Cir. 2012).

23-12533                BRASHER, J., Dissenting                7

*B.*

With this statutory framework in mind, I turn to the facts of this case.

Perfection Bakeries produces and distributes baked goods. Two Perfection facilities, one in Indiana and the other in Michigan, employed workers represented by the Retail, Wholesale and Department Store International Union and Industry Pension Fund. A collective bargaining agreement at each location required Perfection to contribute to the Fund.

In 2016, Perfection stopped offering pension benefits to the union employees in the Michigan facility and stopped contributing to the Fund. This action, withdrawing from one facility, amounted to a partial withdrawal. The parties agree that Perfection's partial withdrawal liability in 2016 (adjusted to present value) was $2,228,268.

Two years later, Perfection completely withdrew from the Fund. Following this complete withdrawal, the Fund calculated Perfection's partial withdrawal liability for 2016 and complete withdrawal liability for 2018. At first, the Fund's actuary applied the partial withdrawal credit after the twenty-year cap, as he has done for every such transaction over his thirty-one-year career. But, due to the Ninth Circuit's intervening judicial decision, the Fund's actuary changed his methodology and applied the partial withdrawal credit at the second step before applying the twenty-year cap.

Under the Fund's interpretation, at the time of Perfection's complete withdrawal, Perfection's allocable amount of unfunded vested benefits amounted to $17,331,978. The amount of the partial withdrawal credit was $1,962,408. After applying the prior partial withdrawal credit at step two, Perfection's allocable amount of unfunded vested liability reduced to $15,369,570. Then the Fund determined that the twenty-year cap was $6,318,741, limiting Perfection's withdrawal liability to that amount.

Perfection agreed that the credit was $1,962,408, but disagreed with the Fund's application of that credit at the second step before the twenty-year cap. Under Perfection's interpretation, its allocable amount of unfunded vested benefits was $17,331,978. No partial withdrawal credit is applied at step two. Applying the twenty-year cap takes the withdrawal liability to $6,318,741. Then, the $1,962,408 credit from Perfection's prior partial withdrawal is applied to that figure for a withdrawal liability of $4,356,333.

Arbitration, then litigation, ensued. And here we are.

## II.

In a statutory interpretation case like this one, our task begins, and often ends, with the statute's text. *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989). We give the words of a statute "their ordinary meaning and import, or such meaning as is given to them by the common sense and understanding of mankind." *United States v. Prescott*, 44 U.S. 578, 581 (1845). "We do not look at one word or term in isolation, but instead we look to the entire statutory context." *United States v. DBB, Inc.*, 180 F.3d 1277, 1281

(11th Cir. 1999). The goal is to "determin[e] the application of a governing text to given facts on the basis of how a reasonable reader, fully competent in the language, would have understood the text at the time it was issued." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 33 (2012).

The statute we are asked to construe in this case is complex—with its many cross references, defined terms, and calculations within calculations. But, if we approach the text as an ordinary user of the statute—a plan sponsor trying to determine how much an employer owes the plan, *see* 29 U.S.C. § 1382—the statute becomes much clearer.

I will start with the parties' arguments and then briefly respond to two points in the majority opinion.

*A.*

Let's start with where the parties agree. When Perfection gave notice that it intended to partially withdraw from the plan, the plan sponsor started its liability calculation by determining Perfection's share of the plan's "unfunded vested benefits" under section 1391. Then it turned to section 1381 to "adjust" that amount through the four steps. At step two, the plan sponsor recognized that this was a "case of a partial withdrawal," so it turned to section 1386. It applied subsection 1386(a) to calculate Perfection's partial withdrawal liability. And, under subsection 1386(b), it knew to give Perfection a credit that matched its partial withdrawal liability for any future withdrawal liability that Perfection accrued in a "subsequent plan year."

Now to where the parties disagree. Perfection did, in fact, make an additional withdrawal in a subsequent plan year; Perfection gave notice that it intended to completely withdraw from the plan. The plan sponsor calculated Perfection's liability for that complete withdrawal by, again, assessing its share of "unfunded vested benefits" under section 1391 and, again, walking through the four steps in section 1381. When the plan sponsor got to step two, it determined that this complete withdrawal was also a "case of a partial withdrawal," because of Perfection's preceding partial withdrawal. So the plan sponsor referred to subsection 1386(b), but not subsection 1386(a), and applied the credit that Perfection had earned from its prior partial withdrawal to the "unfunded vested benefits" as adjusted by the first step. Then the plan sponsor went back to steps three and four in section 1381 to finish calculating Perfection's complete withdrawal liability.

Perfection argues that the plan sponsor erred by applying the partial withdrawal credit at step two. Perfection argues that the plain meaning of subsection 1386(b) requires a dollar-for-dollar reduction to its subsequent "withdrawal liability" as calculated through all four steps of section 1381 because, among other reasons, its complete withdrawal was not a "case of a partial withdrawal" that even implicated the cross reference to section 1386.

I agree with Perfection. I believe its reading best accords with how an ordinary person would understand the text of section 1386, section 1381, and the rest of the statute as a whole. This is so for three reasons.

23-12533                BRASHER, J., Dissenting                        11

First, subsection 1386(b)(1) speaks solely in terms of reducing "withdrawal liability." Specifically, it says that "any withdrawal liability of that employer for a partial or complete withdrawal from that plan in a subsequent plan year shall be reduced by the amount of any partial withdrawal liability." *Id.* "Withdrawal liability" is defined by the statute as "the amount determined" by the four-step process in section 1381. "Statutory definitions control the meaning of statutory words . . . in the usual case." *Lawson v. Suwannee Fruit & S.S. Co.*, 336 U.S. 198, 201 (1949); s*ee also Stenberg v. Carhart*, 530 U.S. 914, 942 (2000) ("When a statute includes an explicit definition, we must follow that definition . . . ."). And I have no doubt that, in a statute as complex as this one, Congress used the words "withdrawal liability" as it had defined the term—to refer to the amount calculated *after* the application of the four steps in section 1381.

Perfection's reading of the statute applies the reduction to "withdrawal liability"—the amount at the end of the four-step process—as the text of the statute provides. But the Fund's alternative reading does not. The Fund's reading does not directly "reduc[e]" the employer's "withdrawal liability." It reduces some other figure—whatever amount is calculated after step one but before step three.

In many ways, the Fund's reading of the statute would substitute "withdrawal liability" in subsection 1386(b) with the phrase "unfunded vested benefits," which is also a defined term. Subsection 1381(b)(1) provides that the "allocable amount of unfunded vested benefits" (which is determined by the calculations provided

in section 1391) will be adjusted by the four steps to arrive at withdrawal liability. And, sure enough, the cross-referenced sections in steps one, three, four and subsection 1386(a) all reference "unfunded vested benefits," or section 1391's calculation for that value, as the starting point for the adjustment. *See* 29 U.S.C. § 1389(a); *id.* § 1386(a); *id.* § 1399(c)(1)(A)(i); *id.* § 1405(a)(1). Likewise, subsection 1386(a), the third step, and the fourth step expressly reference the adjustments in the other steps. *See id.* § 1386(a)(1); *id.* § 1399(c)(1)(A)(i); *id.* § 1405(a)(1). But subsection 1386(b) applies only to "withdrawal liability" without any reference to "unfunded vested benefits" or any of the steps in section 1381. Although these cross references are complicated, the relevant principle of interpretation is simple: "when Congress uses different language in similar sections, it intends different meanings." *Iraola & CIA, S.A. v. Kimberly-Clark Corp.*, 232 F.3d 854, 859 (11th Cir. 2000).

The Fund argues that Perfection's reading adds an extratextual fifth step to the calculation of withdrawal liability in section 1381. But that's not true. Section 1381 tells us how to calculate "withdrawal liability" through the four steps, and the reduction in subsection 1386(b) applies to "withdrawal liability" as calculated. As I see it, the Fund's argument is like saying that slicing a completed cake adds a step to the cake recipe. Even though "withdrawal liability" is fully calculated by following the four steps, "withdrawal liability" can still be modified after it is calculated. In other words, the enumeration of four steps in section 1381 to calculate "withdrawal liability" doesn't preclude additional changes to "withdrawal liability" after those four steps are complete.

23-12533          BRASHER, J., Dissenting          13

Second, Perfection's position is most consistent with the ordinary, commonsense meaning of "in the case of a partial withdrawal" at step two. That step says, in relevant part, that "the withdrawal liability of an employer to a plan is the amount determined under section 1391 of this title to be the allocable amount of unfunded vested benefits, adjusted . . . next, *in the case of a partial withdrawal,* in accordance with section 1386 of this title." 29 U.S.C. § 1381(b)(1)(B) (emphasis added). Perfection says that this phrase means that, when the withdrawal liability that is being calculated is based on a partial withdrawal, one must refer to section 1386. The Fund reads "in the case of a partial withdrawal" to apply the cross reference both (1) when the withdrawal liability being calculated is based on a partial withdrawal and (2) when there has been a partial withdrawal at any point in the past.

The Fund's broader reading of this phrase—that the cross reference also refers to any withdrawal that follows a partial withdrawal—is not the most natural way to understand the phrase "in the case of a partial withdrawal" in the context of the statute. The statute consistently distinguishes between liability for a "complete withdrawal" and a "partial withdrawal." *Compare* 29 U.S.C. § 1381(b)(2), *with* § 1381(b)(3). These terms are mutually exclusive—either a withdrawal is complete, or it is partial. The steps in section 1381 exist so that a plan sponsor can calculate an employer's "withdrawal liability" after the employer has chosen either a "complete withdrawal" as defined in section 1383 or a "partial withdrawal" as defined in section 1385. In this context, the average person would read the cross reference as referring to the event that

14                     BRASHER, J., Dissenting                  23-12533

triggered the assessment of withdrawal liability, not some other event that happened earlier. Step two, then, applies when a plan sponsor is determining the consequences of an employer's present partial withdrawal—that's the "case of a partial withdrawal." *See id.* § 1381(b)(1)(B).

My reading of "case of partial withdrawal" in section 1381 is confirmed by the text of section 1386. *See MSPA Claims 1, LLC v. Tenet Florida, Inc.*, 918 F.3d 1312, 1322 (11th Cir. 2019) (noting that we must read a cross reference "in conjunction with the provision being interpreted"). Section 1386 does two main things. Under subsection (a), it adjusts the "amount determined under section 1391"—that is, the allocable amount of unfunded vested benefits— to account for the partial nature of a partial withdraw. And, under subsection (b), it provides a credit toward *future* withdrawal liability in a "subsequent" plan year based on the amount of the partial withdrawal liability after it is calculated through the four steps. Subsection (a) refers the reader back to step three and step four to finalize the calculation of partial withdrawal liability ("before the application of sections 1399(c)(1) and 1405 of this title"), but subsection (b) does not reference those provisions at all.

Both subsection (a) and subsection (b) operate at the time of a partial withdrawal—(a) adjusts the present partial withdrawal liability and (b) provides an offset to any "subsequent" liability based on the amount of the present partial withdrawal liability. But, when a plan sponsor is calculating liability for a complete withdrawal, section 1386 has nothing to do. There are no calculations

to perform under subsection (a) and no credit to assign to a "subsequent" plan year under subsection (b).

Third, although not dispositive, my view is consistent with the Pension Benefit Guarantee Corporation's longstanding interpretation of these provisions. The statute gives the Corporation a rulemaking role. *See* 29 U.S.C. § 1386(b)(2). And, in an opinion letter issued shortly after the statute's enactment, the Corporation read the reduction in subsection 1386(b) to offset "withdrawal liability" after all the calculations in section 1381 are completed. *See* Pension Benefit Guar. Corp, Opinion Letter 85-4 (Jan. 30, 1985). The Corporation explained that the credit "is an adjustment to withdrawal liability, i.e. a further adjustment to the [s]ection [1381] amount" and, therefore, "must be made after the employer's subsequent withdrawal liability is calculated in accordance with [section 1381]." *Id.* The Corporation's position was apparently not challenged until the dispute that led to the Ninth Circuit's opinion in the mid-2010s.

Although we owe no special deference to this opinion letter, the Supreme Court has recognized that agency "interpretations issued contemporaneously with the statute at issue, and which have remained consistent over time, may be especially useful in determining the statute's meaning." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394 (2024). I believe this letter reflects such an interpretation. The letter was issued within a few years of the statute's passage and has been followed by the regulated community for thirty or forty years. *See United States v. Am. Trucking Ass'ns*, 310 U.S. 534,

549 (1940) (giving weight to the "contemporaneous construction of a statute by the men charged with the responsibility of setting its machinery in motion"). For example, the Fund's actuary testified that he has followed the opinion letter for every calculation he has made over his thirty-one years of experience, including, initially, in this case. *See* Scalia & Garner, *supra*, at 71 ("In everyday life, the people to whom rules are addressed continually understand and apply them."). Especially when we are dealing with a complex statute with multiple potential interpretations, a longstanding practice like this seems a particularly good indication of the statute's ordinary meaning.

### B.

Turning to the majority opinion, it makes two points that warrant a response.

First, the majority opinion finds it important that step two in subsection 1381(b)(1)(B) "expressly incorporates *all* of § 1386" instead of just 1386(a). I agree. But I think the majority opinion draws the wrong conclusion from that textual fact. My reading applies *all* of section 1386 at the same time when the initial partial withdrawal occurs. Subsection (a) tells the plan sponsor how to calculate that year's partial withdrawal liability (including a cross reference back to step three and step four to get the final amount) and subsection (b) tells it to book a credit in the amount of that year's partial withdrawal liability against any withdrawal liability in a "subsequent" plan year.

The majority opinion's reading, however, splits section 1386 into its constituent parts and applies them in a piecemeal fashion over two different transactions. This is how the majority opinion's reading works in practice. At the time of the initial partial withdrawal, only subsection (a) applies—to calculate the partial withdrawal liability for that year. At the time of a future complete withdrawal, only subsection (b) has a field of operation—to apply a credit in the amount of the previous year's partial withdrawal liability at step two of calculating the new year's complete withdrawal liability. The majority opinion's position applies both parts of section 1386 at the same time only when the second transaction is also a partial withdrawal; then, the plan sponsor would refer to subsection (a) to calculate liability for the present year and turn to subsection (b) to apply a credit from a previous year's partial withdrawal in an unrelated amount based on that earlier, unrelated transaction. If someone were concerned about applying "*all* of § 1386," I think he would follow my reading and not the majority opinion's.

Second, the majority opinion says that the partial withdrawal credit must be deducted before "the completion of the four-step process" or else "the process doesn't yield the 'amount' for which the employer 'is liable to the plan.'" I think this inference—which is otherwise logical—ignores the complete text of the statute. Several other sections of the statute expressly reduce or change "withdrawal liability" *after* the plan sponsor fully applies the four steps in section 1381. For example, section 1387 (which is not cross referenced at all in the four steps) provides for "the reduction or

waiver of liability for a complete withdrawal" if an employer returns to the plan. 29 U.S.C. § 1387(a). Section 1388 (also not cross referenced in the four steps) provides for a reduction of partial withdrawal liability if "the number of contribution base units with respect to which the employer has an obligation to contribute under the plan for each such year is not less than 90 percent" of the employer's "high base year." 29 U.S.C. § 1388(a)(1). Because the statute expressly contemplates changes to "withdrawal liability" after it is calculated, there is nothing odd about applying the partial withdrawal credit in subsection 1386(b) in the same way.

## III.

I recognize that my reading of the statute is not the only potential reading. But I believe it is the best one. Because the statute requires that Perfection's "subsequent" complete withdrawal liability be "reduced" by its previous partial withdrawal liability, the Fund's actuary was right the first time. Because the majority opinion concludes otherwise, I respectfully dissent.